JULIUS DOLINER vs. HAROLD BROWN.

Norfolk. March 14, 1985, February 7, 1986. — March 14, 1986.

Present: BROWN, KAPLAN, & DREBEN, JJ.

*Unlawful Interference. Fraud. Consumer Protection Act,* Businessman's claim, Unfair act or practice.

In an action between two competing real estate developers arising out of the defendant's acquisition of an apartment building which the plaintiff had been negotiating to purchase, the judge was warranted in concluding that the defendant had not committed an actionable interference with the plaintiff's potential contractual relations, where the evidence showed that the defendant, as a competitor, had acquired the building for his own commercial advantage, and not to injure the plaintiff. [695-696] BROWN, J., concurring.

Conduct of a real estate developer in acquiring an apartment building for conversion to condominium units, the purchase and conversion of which another developer had been negotiating, did not, in the circumstances, constitute an "unfair method of competition" or an "unfair or deceptive act or practice" cognizable under G. L. c. 93A. [696-698] BROWN, J., dissenting.

CIVIL ACTION commenced in the Superior Court on May 4, 1978.

The case was heard by *John Paul Sullivan,* J.

*Barbara L. Moore* for the plaintiff.

*Gerald P. Tishler (Kathleen A. Larocque* with him) for the defendant.

KAPLAN, J. Upon full findings of fact, a judge of the Superior Court ruled, first, that the defendant Harold Brown had not committed an actionable interference with the plaintiff Julius Doliner's prospective contractual relations concerning a condominium conversion, and, second, that he did not stand in breach of G. L. c. 93A, § 11. Doliner does not contest the judge's findings of fact,[1] and we are persuaded that the judge

---

[1] The record appendix consists in substance of the judge's fact findings and conclusions of law; it does not include any part of the trial proceedings.

was right in his application of the law. We do no more than outline the situation and comment briefly on the legal propositions.

Doliner, an experienced real estate developer and contractor, learning that the owners were disposed to sell an apartment building at 50 Green Street, Brookline, decided to buy it, if he could, and convert it to condominium units. He began to negotiate with the owners and at the same time to search for primary and secondary financing. In the latter behalf he met with Raymond C. Green and Richard K. Bendetson. Doliner told them the details of his plan for the purchase and conversion of the property, and sought to interest them in providing a second mortgage for $350,000 (against an assumed purchase price of about $1,310,000). There is no indication that Doliner asked these men to keep his purpose or plan confidential. They said they would attempt to get a third person (undisclosed) to participate in the loan.

From the meeting with Doliner, Green and Bendetson — as independent businessmen, the judge held, not as agents of Doliner — went to see Harold Brown. Brown was a man with large experience in real estate investments in general, and in condominium properties in particular; he had been involved in many condominium conversions. Brown heard the details of Doliner's plan from Green and Bendetson who, as far as appears, did not pledge Brown to any kind of secrecy or circumspection. Brown said he would consider seriously taking a fifty percent position in the secondary loan.[2] He said he would

---

[2] After hearing oral argument on the present appeal, we entered an order requesting clarification of the trial judge's findings on the question: "Did the defendant Brown *undertake* to participate in the secondary financing of the plaintiff Doliner's condominium project?" (Emphasis added.) We read the original findings as negative on this point, but thought it best to eliminate doubt. The trial judge wrote as follows by way of answer and further finding of fact: "Although Brown considered participating in the secondary financing of Doliner's condominium project in the status of financier, a commitment to do so was never finalized and Brown remained as a trade competitor for the purchase of the Green Street property. Brown had no privity with Doliner or his agents with respect to the purchase of the property, and no fiduciary responsibilities existed between them in this regard."

In a memorandum attached to his answer, the judge stated that he had afforded counsel a hearing and an opportunity to file memoranda. Because

seek background information about the project from Robert Keezer, a broker or salesman of condominium units. In fact, Keezer already knew of Doliner's interest in the property and had mentioned it to Brown perhaps a month earlier.

Although Green and Bendetson advised against calling Keezer, Brown promptly did so and asked Keezer to find out from Jordan Friedman (who had been sounded on primary financing) whether he, Brown, could secure an equity position in the transaction. Keezer called Friedman and then communicated to Brown that under Doliner's latest plan Doliner would take the entire equity. At this point, Keezer, who evidently had had some hope of participating in the equity perhaps as consideration for acting as broker in the sale of the units, began to feel that he would do better with Brown as purchaser and developer than with Doliner in the same role. Now Brown (with Keezer's support) began to aim at acquiring the property for himself.[3]

Friedman reported the Keezer call to Doliner. When the substance of that call was relayed by Doliner to Green, Green said he did not believe Brown was maneuvering for equity; and Doliner, apparently reassured, told Friedman that Brown's involvement was limited to the secondary financing. Doliner did not confront Brown at this time, nor did the two ever communicate with one another.

We reach a time when a purchase price of $1,310,000 had been settled between Doliner and the owners but a draft of purchase and sale contract had not been fully agreed, and Doliner's financing was still uncertain and inconclusive. At

---

of the lapse of time since trial, he had no independent memory of the case; his answer was based on his memory of the submission of proposed findings and reasonable inference that a difficulty with paragraph 22 of his original findings was a result of his failure to edit properly the plaintiff's proposed paragraph. He concluded that paragraph 22 should be amended to eliminate any doubt, and set out an amended paragraph in the sense of his answer as quoted above.

See also n.4 below.

[3] The judge stated that he rejected testimony by Keezer and Brown that Brown had not moved actively to acquire the property until about the time the owners cut off negotiations with Doliner.

that point the owners broke off negotiations with Doliner and sold to Brown at the same price and under terms which in some particulars were more favorable to Brown than those tendered to Doliner. The judge found that were it not for Brown's closing with the owners, they would have signed a purchase and sale agreement with Doliner if he had been able to achieve satisfactory financing.[4] Recriminations by Green and Bendetson after the event need not be detailed. Keezer wound up acting as broker of the units.

1. As one of the actors in this story put it, Brown "scooped" Doliner. That, however, was far from encompassing the tort of interference with prospective contractual relations. A competitor may "interfere" with another's contractual expectancy by picking the deal off for himself, if, in advancing his own interest, he refrains from employing wrongful means. See Restatement (Second) of Torts § 768 (1979); Nolan, Tort Law § 72, at 85-86 (1979). Acknowledging this generalization, the plaintiff's argument expends itself in an effort, first, to show that Brown did not stand in the relation of a competitor to Doliner because he was approached by Green and Bendetson as a second mortgage lender and expressed interest in joining in the loan, and was not then announcing himself as angling for the equity. Surely this conceives of "competitor" too narrowly. It is enough that Brown was seeking to acquire the same object, not in order to inflict injury on Doliner, but for his own commercial advantage; moreover, Brown was known to be an operator in many departments of the real estate game, including condominium conversion. Compare *Candalaus Chicago, Inc.* v. *Evans Mill Supply Co.,* 51 Ill. App.3d 38, 48-49 (1977), with *Lowell* v. *Mother's Cake & Cookie Co.,* 79 Cal. App.3d 13, 21 (1978). So far as the question of "com-

---

[4] In addition to our question at n.2 above, we asked the trial judge to respond to the question: "Were the defendant Brown's actions (including any failures to act) the proximate cause of the plaintiff Doliner's alleged injuries?" We understood the original findings to be negative on this point, but again desired to eliminate doubt. The trial judge's answer and further finding of fact was: "Brown's actions and/or failures to act were not the proximate cause of Doliner's injuries. At the time of Brown's purchase of the Green Street property Doliner's ability to purchase it was uncertain."

petition" is one of fact, the judge's finding controls. See *H & M Associates* v. *El Centro,* 109 Cal. App.3d 399, 409 (1980).

Second, the plaintiff seeks to show that Brown was guilty of an independent tort or something close to it.[5] However, the elements of fraudulent representation were not present, nor anything that can be nearly assimilated to them. It would be hard to find a basis for imposing a duty on Brown to declare that he was now in the lists to acquire the equity. Indeed, Doliner was given warning by Friedman of the fact but he reacted mildly.[6]

2. The remedy of businessman against businessman of G. L. c. 93A, § 11, may be invoked against an "unfair method of competition" or an "unfair or deceptive act or practice declared unlawful by [§ 2] or by any rule or regulation issued under [§ 2(c)]" by the Attorney General. These references point to Federal Trade Commission lore as a source of interpretation. As to the first-quoted phrase, Brown was not engaged in any practice considered abusive of, or injurious to competition such as may be discerned in the theft of trade secrets,[7] or in passing

---

[5] The facts are such that it makes no difference to the result in this case whether the plaintiff has the whole burden of proof of an actionable interference or, to the contrary, the defendant must show justification. Compare Restatement (Second) of Torts §§ 766B, 767 comment k (1979), with *Owen* v. *Williams,* 322 Mass. 356, 360 (1948), and see the discussion in *Leigh Furniture & Carpet Co.* v. *Isom,* 657 P.2d 293, 302-304 (Utah 1982).

[6] The judge held there was no basis for a suggestion that a fiduciary relationship arose between Doliner and Brown by which Brown might become a "trustee" barred from using to his own advantage information derived from Doliner. Doliner imparted no information to Brown, and, as noted above, Green and Bendetson were acting for themselves, not Doliner. Doliner attached no restrictions to the information he passed to these two, nor did the latter attempt to restrict Brown. The judge pointed out, further, that Brown had actually learned of the prospect from Keezer well before Green and Bendetson interviewed him. For a contrasting case in which a confidential relation may have arisen between the plaintiff and the defendant bank, from which the plaintiff sought to borrow in order to finance his purchase of property, so that the bank might be barred from purchasing the same property through its related corporation for its own benefit, see *Dolton* v. *Capitol Fed. Sav. & Loan Assn.,* 642 P.2d 21, 23 (Colo. App. 1981).

It may be added that the details of Doliner's plan are not claimed to rank as a "trade secret" (even if secrecy had been preserved).

[7] *Peggy Lawton Kitchens, Inc.* v. *Hogan,* 18 Mass. App. Ct. 937, 939 (1984).

off,[8] or in adjacent business torts. See Pirozzolo, Chapter 93A: The Massachusetts Little FTC Act — A Potent Unexplored Remedy in Business Disputes, 62 Mass.L.Q. 77 (1977). Embraced in the other quoted phrase have been examples of extortion or similar oppression,[9] breach of warranty,[10] misrepresentation,[11] betrayal of fiduciary duty,[12] violation of specific regulations of the Attorney General.[13] It is recognized that the language is broad enough to take in some reprehensible acts committed in business contexts that elude conventional definitions and categories.[14] The courts are not invited by the statute to punish every departure from "the punctilio of an honor the most sensitive" (*Meinhard* v. *Salmon,* 249 N.Y. 458, 464

---

[8] *Professional Economics, Inc.* v. *Professional Economic Servs., Inc.,* 12 Mass. App. Ct. 70, 80-81 (1981).

[9] *Frank J. Linhares Co.* v. *Reliance Ins. Co.,* 4 Mass. App. Ct. 617, 621 (1976). Cf. *Commonwealth* v. *DeCotis,* 366 Mass. 234, 241-243 (1974).

[10] *Linthicum* v. *Archambault,* 379 Mass. 381, 387 (1979).

[11] *International Fid. Ins. Co.* v. *Wilson,* 387 Mass. 841, 848 (1983). *Levings* v. *Forbes & Wallace, Inc.,* 8 Mass. App. Ct. 498, 504 (1979).

[12] *Nader* v. *Citron,* 372 Mass. 96, 101 (1977).

[13] *V.S.H. Realty, Inc.* v. *Texaco, Inc.,* 757 F.2d 411, 416 (1st Cir. 1985). Cf. *Slaney* v. *Westwood Auto, Inc.,* 366 Mass. 688, 702 (1975).

[14] On occasion, as in *PMP Associates* v. *Globe Newspaper Co.,* 366 Mass. 593, 596 (1975), this point has been elaborated by reference to a remark by the FTC at 29 Fed. Reg. 8324, 8355 (July 2, 1964): "No enumeration of examples can define the outer limits of the Commission's authority to proscribe unfair acts or practices, but the examples should help to indicate the breadth and flexibility of the concept of unfair acts or practices and to suggest the factors that determine whether a particular act or practice should be forbidden on this ground. These factors are as follows: (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen). If all three factors are present, the challenged conduct will surely violate Section 5 even if there is no specific precedent for proscribing it. The wide variety of decisions interpreting the elusive concept of unfairness at least makes clear that a method of selling violates Section 5 if it is exploitive or inequitable and if, in addition to being morally objectionable, it is seriously detrimental to consumers or others. Beyond this, it is difficult to generalize."

[1928]), but they may enforce standards of behavior measurably higher than perfidy. They need not necessarily endorse a pattern of behavior because it happens to be current in the market place. We tried to suggest a mood, although we could not prescribe a rule, when we said in *Levings* v. *Forbes & Wallace, Inc.,* 8 Mass. App. Ct. 498, 504 (1979), that a new tort may be recognized under § 11 when the questioned conduct "attain[s] a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." See also *Spence* v. *Boston Edison Co.,* 390 Mass. 604, 616 (1983). The situations have to be sized up one by one. In our view the present case is outside § 11 unless we are prepared to say that the statute enacts a rule of noblesse oblige by which a party is to be barred from competing for a business advantage because he is made aware that another has been exerting himself to the same end. That would be an extravagant rule of law.[15]

We are not called on to say whether before a tribunal of pure conscience Brown would be held deserving of the rebuke he got after the event on the part of Green and Bendetson.

*Judgment affirmed.*

BROWN, J. (concurring in part and dissenting in part). It is with utmost reluctance that I concur, even in part. I only wish that the law would aid the needy as assiduously as it does the greedy. Brown did more than sabotage Doliner's contractual expectancy; he "pick[ed] the deal off for himself." The judge found that, were it not for Brown's closing with the owners, they would have signed a purchase and sale agreement with Doliner, assuming the latter had been able to achieve satisfactory financing.

In the real estate game, one never commits fully until the "numbers" have been canvassed fully. Here, the numbers were very clearly set out by Green and Bendetson during their visit to Brown. Brown told them that he would consider seriously

---

[15] See the discriminating analysis of a different situation in *Zapatha* v. *Dairy Mart, Inc.,* 381 Mass. 284 (1980).

taking a fifty percent position in the *secondary financing* of the deal. No sooner had the two messengers departed than the defendant rushed to the phone, putting in motion his plan to "scoop" the entire deal.[1] If that is not wrong — and the majority opinion concludes that it is not wrong under principles of common and statutory law — then perhaps there is something amiss in the common law and in our statutory scheme.

It is not enough for me that the common law be viewed as simply a mirror of the manner and mores of the marketplace. Fundamental principles of decency and fairness, resplendent in other areas of common law, ought to be recognized here.[2] I disapprove of a view which condones conduct as reprehensible as that exhibited by the defendant in this case. Ethics and morality do have a place in our economic system, the greatest example of capitalism in the history of the world. In this regard, see the instructive discussion in *Meinhard* v. *Salmon,* 249 N.Y. 458, 464 (1928). Nevertheless, having reviewed the authorities cited in the majority opinion, and mindful of the role of an intermediate appellate court not "to alter established rules of law governing principles of substantive liability" (*Burke* v. *Toothaker,* 1 Mass. App. Ct. 234, 239 [1973]), I am constrained to join in part 1 of the majority opinion.

Turning from the common law to our own statutory law, I respectfully dissent from the majority's view that the defendant's conduct was not actionable under G. L. c. 93A, § 11. In formulating applicable standards of conduct under c. 93A, we are advised "to discover and make explicit those unexpressed standards of fair dealing which the conscience of the com-

---

[1] The judge found that Brown, in seeking to position himself, called Keezer, a person Green and Bendetson specifically advised against calling. The judge further found incredible the testimony of Keezer and Brown that Brown had not tried to acquire the property while Doliner was still engaged in negotiations with the owner. See n.3 of the majority opinion.

[2] Even assuming Brown had no duty to "announc[e] himself as angling for the equity," he certainly had an affirmative duty to disclose that he no longer had an interest in participating in the secondary loan. There also might have been shown a violation of the moral imperative that "thou shall not seduce another's agent" if Keezer's connection with Doliner had been developed further at trial, because Keezer's actions on behalf of Brown certainly were intended to be of advantage to himself and Brown at the expense of Doliner.

munity may progressively develop." *Commonwealth* v. *De-Cotis,* 366 Mass. 234, 242 (1974), quoting Judge Learned Hand in *FTC* v. *Standard Educ. Soc.,* 86 F.2d 692, 696 (2d Cir. 1936), rev'd in part, 302 U.S. 112 (1937). In this case, I would characterize the totality of the defendant's conduct as having been infused with a high enough "level of rascality" (*Levings* v. *Forbes & Wallace, Inc.,* 8 Mass. App. Ct. 498, 504 [1979]) not only to have raised the plaintiff's eyebrow, but also to have permitted him to recover under § 11. I reject the suggestion, implicit in the majority's view of the circumstances, that if one knows there is a shark in the water, one must take special precautions to avoid being eaten. I am not prepared to say that the law should afford greater protection to real estate sharks than it does, for example, to banks. Compare *Dolton* v. *Capitol Fed. Sav. & Loan Assn.,* 642 P.2d 21, 23-24 (Colo. App. 1981). See also *Warsofsky* v. *Sherman,* 326 Mass. 290, 293-295 (1950).

Chapter 93A has established in general, for businesses as well as for consumers, a path of conduct higher than that trod by the crowd in the past. Cf. *Meinhard* v. *Salmon,* 249 N.Y. at 464. It troubles me to see such a substantial deviation from that path.