ARTHUR D. DOWD, JR. *vs.* PAUL J. IANTOSCA.[1]

No. 87-1060.

Suffolk. September 20, 1988. — May 16, 1989.

Present: PERRETTA, KAPLAN, & WARNER, JJ.

*Unlawful Interference. Consumer Protection Act,* Unfair act or practice, Damages. *Damages,* Consumer protection case.

The evidence presented at the trial of a civil action supported the judge's findings that the plaintiff had a business relationship or contemplated contract of economic benefit with the seller of certain real property and that the defendant had intentionally interfered with that relationship. [331-332]

The defendant in a civil action alleging his tortious interference with an advantageous or contractual relationship of the plaintiff could not raise for the first time on appeal a claim that his conduct had constituted competition and was, therefore, justified or privileged. [332-333]

The judge at the trial of a G. L. c. 93A claim, based on the defendant real estate broker's alleged tortious interference with the plaintiff's advantageous or contractual relationship with a seller of real property, did not err in concluding that the defendant's intentional interference was unwarranted, improper, and egregious, and in violation of his ethical obligations as a real estate broker. [333-334]

In a civil action, no error appeared in the judge's measure of damages in a G. L. c. 93A claim or in his award of double damages thereunder. [334-335]

CIVIL ACTION commenced in the Superior Court Department on July 26, 1983.

The case was tried before *Cortland A. Mathers,* J.

*Marcus E. Cohn (Robert A. Whitney* with him) for the defendant.

*Eileen M. Donoghue (Susan J. Matthew* with her) for the plaintiff.

---

[1] Individually and as trustee of Arborview Realty Trust.

PERRETTA, J. While the plaintiff Dowd was still negotiating with the sellers for the purchase of their house, which was listed exclusively with the defendant Iantosca's real estate agency, Iantosca inspected the premises and decided to buy the property for himself. He designed an offer to purchase that gave the appearance of being better than Dowd's and presented it to the sellers, through his employee, a licensed salesperson who had been working with Dowd and the sellers. The sellers accepted the offer, and Iantosca purchased the property for the same amount offered by Dowd. The trial judge found and concluded that Iantosca had interfered with a relationship advantageous to Dowd and that his conduct was egregious and in violation of G. L. c. 93A. Iantosca argues on appeal that, as there was no relationship between Dowd and the sellers which precluded him from seeking to buy the rental property for himself, his conduct was neither tortious nor unfair. We affirm.

I. *The Evidence.*

Whether conduct falls within the scope of c. 93A is a question answered on the circumstances of the individual case. See *Spence* v. *Boston Edison Co.*, 390 Mass. 604, 616 (1983). There was evidence of the following facts. Iantosca, a licensed real estate broker, owned, managed, and worked out of Pleasant Realty, a real estate office located in Jamaica Plain. Kathleen Kennedy, a licensed salesperson, was one of his several employees. Because she was not a licensed broker, she sold real estate under Iantosca's license. Dowd met Kennedy in 1982, when he bought property for his plumbing business through Pleasant Realty.

In February of 1983, Dowd decided that he would like to buy a three-family house in Jamaica Plain for purposes of rental income. He went to see Kennedy at Pleasant Realty, and she told him about the property here in issue. The house was owned by two elderly sisters, who occupied the first floor, and their niece, who lived in West Roxbury. The asking price was $39,900. After viewing the premises, Dowd presented a written offer to purchase for $35,000 and a check in the amount of $500, payable to Pleasant Realty, to Kennedy. The offer

was subject to three conditions, only one of which is here
pertinent: "decontrol certificates or house being vacant." The
offer further provided for a purchase and sale agreement to be
executed by March 9, 1983, and title to be delivered on May
1, 1983. The sellers accepted the offer on February 25, 1983,
and Kennedy deposited Dowd's check in Iantosca's account.

When the sellers tendered a purchase and sale agreement in
the beginning of March, Kennedy set up a meeting between
Dowd and the sellers at Pleasant Realty. Dowd did not appear
at the appointed time, and Kennedy spoke with him over the
telephone. He explained that he was unable to attend and
suggested that the sellers sign the agreement as scheduled and
that he would come to Kennedy's office the next day and do
the same.

That arrangement was satisfactory to the sellers, who signed
the agreement. When Dowd appeared the next day, he saw
that the agreement was not conditioned upon either the sellers
providing him with decontrol certificates or the house being
vacant. He refused to sign.

As Dowd explained to Kennedy, it was his understanding
that, because the house was owner-occupied, the rental rate
for the other two units was established by the rental market.
Although the market rate then being charged for those units
was acceptable to him, he did not intend to reside in the house.
He feared that under his ownership the units would be subject
to rent control, and the rental rates would be rolled back to
the controlled rate in effect in 1976. Were that to happen, he
would be unable to pay the mortgage on the property, let alone
realize any profit from it. Negotiations then began with the
sellers and Dowd communicating through Kennedy.

For various reasons, all communicated to Kennedy by the
sellers' attorney, the sellers did not want to be responsible for
obtaining decontrol certificates and refused to include that con-
dition in the purchase and sale agreement.[2] Dowd told Kennedy
that since he was not the owner, he could not properly undertake

_____

[2] Because of their ages and infirmities, the sisters were not able to get
about easily. There was also suggestion that one of the sisters was not
entirely mentally alert.

that responsibility. This state of affairs did not, however, lead the parties to cease their negotiations and go their separate ways. They continued to try to reach a resolution acceptable to everyone. Dowd was in almost daily contact with Kennedy throughout all of March.

In the meantime, Iantosca suggested to Kennedy that the rents should be raised to see if the tenants would vacate rather than pay the increase. Kennedy related that possibility to Dowd, but he rejected it. He believed that the at-will tenants were elderly and that they had lived in the house for many years. Iantosca next suggested to Kennedy that she give the tenants, on behalf of the sellers, thirty-day notices to quit. If the tenants voluntarily relocated, the house would be vacant and Dowd would be satisfied. Kennedy caused notices to quit to be given the tenants on March 1, 1983.

This proposed resolution partially satisfied Dowd, but he was still reluctant to sign the agreement at that time. He wanted to wait for the tenants' reaction to the notices. If they vacated the premises timely and voluntarily, he would be satisfied. If they resisted the demand to vacate or resorted to litigation, he did not want to be bound by the agreement. So began a waiting period for Dowd and the sellers. During that time, all of March, no action was taken by any of the parties to terminate their dealings with one another. Dowd's attorney was negotiating with the sellers' attorney, and Dowd was speaking with Kennedy on a daily basis.

March 9 (which according to the offer was the date when the purchase and sale agreement was to be executed) passed without concern on the part of Dowd, the sellers, or their attorneys. At Pleasant Realty, however, another broker complained to Kennedy about the wait because he wanted to show the house to prospective buyers. Kennedy advised Dowd that she was under pressure to put the property back on the market.

By mid-March, the pressure on Kennedy increased, this time coming from Iantosca. He told her that he was interested in buying the house and wanted to inspect it. Kennedy responded that she thought that would be inappropriate as Dowd and the

sellers were still negotiating and their lawyers were working with each other. Iantosca was unimpressed. It was his position that Dowd's offer to purchase had expired as of March 9, 1983. Since a purchase and sale agreement had not been signed, the property was available. Kennedy showed him the house.[3]

Immediately after his inspection, Iantosca presented an offer to purchase to Kennedy which he wanted related to the sellers so as to appear to them more favorable than Dowd's offer of $35,000. Iantosca would meet the sellers' price of $39,900. However, they would have to repair the porches (including scraping, priming, and painting), clean the yard and remove all debris, and install additional wiring circuits in the three kitchens. In the event the sellers did not complete the work by the closing date, Iantosca would be entitled to a rebate in the amount of $4,900. Iantosca knew that the sisters were very elderly and sick and unlikely to do the required work, although he thought that there was a chance that they might have it done. Kennedy refused to present his offer to the sellers.

As Dowd and the sellers waited for the tenants' reaction to the notices to quit, Iantosca pressed Kennedy. As the days passed, he told her to stop dealing with Dowd and to tell the sellers that Dowd's "deal was dead." He accused her of trying to protect the sale for Dowd, and he offered her money to present his offer to the sellers. When Kennedy held firm, Iantosca told her that she was "stupid" not to take his money and present his offer to the sellers because Dowd was not "going to end up with the house anyway." He told Kennedy that his offer was in fact better than Dowd's because it was not conditioned upon the house being vacant.

Kennedy urged Dowd to sign the purchase and sale agreement and warned him that Iantosca wanted to make an offer on the property for himself. Believing that Kennedy was only trying to pressure him, Dowd told her not to be foolish, that since he and the sellers were still negotiating, Iantosca could not buy the property. Disturbed by the prolonged negotiations

---

[3] Kennedy testified that when she showed Iantosca the house, no one was there. Iantosca contradicted her testimony and stated that he met the sisters when he inspected the property.

in the face of Iantosca's daily insistence, Kennedy discussed the situation with other salespersons and brokers at Pleasant Realty and called the Greater Boston Real Estate Board. She then called one of the sellers, the niece, and told her that Iantosca wanted to make an offer on the house. The sellers spoke with their lawyer, and the niece called Kennedy and told her that, before considering any offer from Iantosca, they wanted to see if Dowd's offer would work out.

Dowd visited Kennedy at Pleasant Realty on March 31 to check on the progress being made with the tenants. She warned him that if he did not sign the purchase and sale agreement by the next day, Iantosca intended to buy the property. Dowd said he would get back to her before then. As soon as Dowd left Kennedy's office, Iantosca told Kennedy to present his offer to the sellers immediately. Kennedy did so, the sellers decided to let Dowd's offer go, and Kennedy brought them the necessary papers for their signatures.[4]

While all these arrangements for Iantosca's purchase of the property were hastily being made, Dowd was reconsidering the risk of signing the condition-free agreement. He decided to take it and called Kennedy to tell her he would sign the agreement. Having just returned to the office, Kennedy told him that he was too late and that Iantosca had just bought the property.

Dowd went directly to his attorney, who did not believe him and called Kennedy. She confirmed the fact that Iantosca had purchased the property that very day. When the lawyer asked to speak with Iantosca, Kennedy went into Iantosca's office and explained who wanted to speak with him and why. Iantosca accepted the call and assured Dowd's lawyer that he had not purchased the house. The purchase and sale agreement between Iantosca and the sellers is dated April 1, 1983.

On or about April 6, 1983, Dowd received a check from Pleasant Realty in the amount of his February deposit, $500, and a letter from the office manager advising him that his

---

[4] Kennedy never accepted any money from Iantosca on account of presenting his offer to purchase. She also rejected his later suggestions concerning her anticipated testimony at trial.

"steadfast refusal" to sign the agreement had "effectively nullified the offer" and caused the property to be put back on the market and that the sellers "have now accepted another offer and the property is under agreement."

Title to the property was transferred to Iantosca on June 3, 1983. Although the deed recites a $39,900 purchase price and the adjustment sheets do not reflect any credit concerning repair work, Iantosca in fact paid the sellers $35,000, the amount of Dowd's offer.

At the conclusion of all the evidence, the trial judge granted Dowd leave to amend his complaint, which was based upon claims of interference with a contractual or advantageous relationship, to add a count under G. L. c. 93A, §§ 2 and 11. The tort claims were put to the jury, and they returned a verdict for Dowd in the amount $97,500, the fair market value of the property at the time of trial less the purchase price offered by Dowd. The trial judge made findings of fact on the c. 93A claim and concluded that Iantosca's conduct was "egregious" and in breach of the statute. He awarded Dowd double damages, assessed counsel fees, and entered judgment on that claim.

II. *The Advantageous Relationship.*

It has been Iantosca's position from the beginning of this dispute that he did not interfere with either a contractual or other advantageous relationship. His reasoning is as follows. When Dowd and the sellers failed to execute a purchase and sale agreement on or before the deadline recited in the offer (March 9), the offer ceased to exist and became a nullity. Because the offer had expired and did not exist after March 9, it could not be modified by the subsequent words and conduct of Dowd, the sellers, and those acting on their behalf. Therefore, there was no contractual relationship between Dowd and the sellers when Iantosca pressed and presented his offer. Proceeding to the next basis for liability, Iantosca claims that there was no advantageous relationship between Dowd and the sellers because Dowd refused to sign a purchase and sale agreement unless it was contingent upon a condition rejected by the sellers.

Whether there was a contract binding the sellers to Dowd after March 9 is not a pivotal question. The trial judge's conclu-

sion that Iantosca had improperly interfered with Dowd's "contractual *and* otherwise advantageous relationship" (emphasis supplied) rests upon his findings: (1) that neither the sellers nor anyone acting on their behalf gave any indication to Dowd that they intended to rely upon the March 9 deadline until after Iantosca inspected the property and became interested in it; (2) that Iantosca presented an offer which he deliberately designed to give an appearance to the elderly sellers as being better than that made by Dowd; (3) that Iantosca presented his offer while Dowd and the sellers were still negotiating with each other; and (4) that, had Iantosca not interfered, Dowd "unquestionably would have proceeded to buy the property for $35,000."

We think it apparent from the trial judge's findings (read in their entirety) that the phrase "contractual and otherwise advantageous relationship" comprehends " 'a business relationship or contemplated contract of economic benefit. . . .' J.R. Nolan, Tort Law § 72, at 87 (1979). See *Owen* v. *Williams*, 322 Mass. 356, 360 (1948). See also *Chemawa Country Golf, Inc.* v. *Wnuk*, 9 Mass. App. Ct. 506, 509 (1980)." *Comey* v. *Hill*, 387 Mass. 11, 19 (1982). See also Restatement (Second) of Torts § 766B (1979), concerning interference with a "prospective contractual relation." It is also apparent from our detailed recitation of the evidence that there is ample support for the trial judge's findings which, in turn, support his conclusion that Iantosca's interference was intentional. See *Comey* v. *Hill*, 387 Mass. at 19; *Chemawa Country Golf, Inc.* v. *Wnuk*, 9 Mass. App. Ct. at 509.

III. *The Tortious Interference.*

Iantosca argues that, even if an advantageous relationship existed, his conduct was not wrongful or improper. Relying upon *Doliner* v. *Brown*, 21 Mass. App. Ct. 692, 695 (1986), he contends that his conduct constitutes competition and was, therefore, justified or privileged. "A competitor may 'interfere' with another's contractual expectancy by picking the deal off for himself, if, in advancing his own interest, he refrains from employing wrongful means." *Ibid.*

This claim is raised for the first time on appeal. We will not and cannot consider it. As stated in *H & M Associates* v. *El Centro*, 109 Cal. App. 3d 399, 409 (1980), cited in *Doliner* v. *Brown*, 21 Mass. App. Ct. at 696, "[w]hether defendants' conduct of interfering with existing contracts with third persons was justified under the circumstances and thus privileged, comprises a factual issue which should properly be placed before the trier of fact." The only issue framed by Iantosca's answer to the complaint was whether a contractual or advantageous relationship existed, and that was the only issue put to the jury on appropriate instructions to which no objection was taken. See *Rice* v. *James Hanrahan & Sons*, 20 Mass. App. Ct. 701, 703-704 n.7 (1985). Although *Doliner* v. *Brown* had not been decided at the time of trial, the c. 93A claim was not decided until well over a year after *Doliner* and after Iantosca's submission of requests for findings of fact and rulings of law. There is nothing in that submission which can be construed as raising the issue of "competition as proper or improper interference." Restatement (Second) of Torts § 768.

Even had this theory been put before the judge on the c. 93A claim, it is most unlikely that we would conclude that Iantosca's conduct constituted appropriate and protected competition. See Restatement (Second) of Torts § 767 & comment g ("[B]oth social and private interests concur in the determination that persuasion only by suitable means is permissible, that predatory means like . . . fraud are neither necessary nor desirable incidents of competition") and § 768(1)(b).[5] Compare *DiBurro* v.

---

[5] There was evidence to show that under Articles 7 and 12 of the Code of Ethics of the National Association of Realtors, adopted by the Greater Boston Real Estate Board, Iantosca was obligated "to protect and promote the interests of the client," "to treat fairly all parties to the transaction," and not to "undertake to provide professional services concerning a property . . . where he has a present or contemplated interest unless such interest is specifically disclosed to all affected parties." In deciding the c. 93A claim, the trial judge denied Iantosca's requests for rulings that he had not violated his ethical obligations. It is apparent from his findings of fact and conclusions of law that the trial judge's denial of Iantosca's requests was based upon Kennedy's testimony concerning Iantosca's offer and the manner in which it was to be presented to the elderly sellers. See and compare *Doliner* v. *Brown*, 21 Mass. App. Ct. at 698-699 (Brown, J., concurring in part).

*Bonasia,* 321 Mass. 12 (1947), and *Doliner* v. *Brown,* 21 Mass. App. Ct. at 696 n.6, with the facts in the instant case.

Considering those factors suggested in § 767 of the Restatement[6] and the comments thereto in light of the evidence presented, we see no error in the trial judge's conclusion that Iantosca's intentional interference was unwarranted and improper.

IV. *Chapter 93A Liability.*

Little discussion is here required. The trial judge described Iantosca's conduct as "unwarranted," "egregious," and in violation of his ethical obligations as a real estate broker. All that need be said about Iantosca's liability under c. 93A, §§ 2 and 11, has been said in *Doliner* v. *Brown*, 21 Mass. App. Ct. at 697-698, and the cases therein cited, including *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979).

V. *Damages.*

As found by the trial judge, Dowd wanted the property for commercial purposes. Although Dowd's primary occupation was his plumbing contract business, he also owned and developed rental income property. With respect to the premises in question, Dowd intended to improve the plumbing and heating facilities, make cosmetic repairs, and rent the units. But for Iantosca's wrongful interference, Dowd would have bought the property.

In determining the amount of damages to be awarded Dowd under c. 93A, the trial judge accepted the amount found by the jury on the tort claim. Cf. *Whitehall Co.* v. *Barletta*, 404 Mass. 497, 499 (1989). The jury were instructed that damages were to be measured by the fair market value of the property, in its 1983 state, as of the time of trial. We see no error in the

---

[6] Section 767 reads, in full: "In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties."

trial judge's measure of damages. Had Dowd purchased the property, one of the benefits of that purchase would have been the increase in its value. See Restatement (Second) of Torts § 774A. Cf. *Welch* v. *Kosasky*, 24 Mass. App. Ct. 402, 406-407 (1987); Scott, Trusts § 208.3 (4th ed. 1988). We see no error in the trial judge's measure of damages nor in his award of double damages. Iantosca's one-sentence claim that the award cannot stand because of a lack of evidence showing that his violation of c. 93A was wilful strikes us as being a half-hearted, if not frivolous, assertion.

VI. *Conclusion.*

Because of our decision on the c. 93A claim, we need not consider the many arguments made by Iantosca in respect to the jury proceedings. The judgment is affirmed, and the plaintiff is to recover from the defendant his appellate counsel fees in an amount to be determined by a judge of the Superior Court.

*So ordered.*