### INDUSTRIAL GENERAL CORPORATION
v.
### SEQUOIA PACIFIC SYSTEMS CORPORATION.

Civ. A. No. 89–2035–RGS.

United States District Court,
D. Massachusetts.

April 11, 1994.

Mary J. Ryan, Lyne, Woodworth & Evarts, Boston, MA, for plaintiff Indus. Gen. Corp.

Stanley W. Wheatley, Gordon & Wise, Boston, MA, for defendant Sequoia Pac. Systems Corp.

*MEMORANDUM OF DECISION ON PLAINTIFF'S CLAIM OF A VIOLATION OF G.L. c. 93A AND REQUEST FOR AN AWARD OF COSTS AND ATTORNEY'S FEES*

STEARNS, District Judge.

### BACKGROUND

This case arose out of an unhappy business relationship between the defendant, Sequoia Pacific Systems Corporation [Sequoia] and Plastek, a subsidiary of the plaintiff Industrial General Corporation [IGC]. The fundamental dispute is not nearly as complex as the years of legal wrangling that eventually brought the parties before a federal jury. In essence, IGC's complaint was for simple common law breach of contract. Sequoia's defense was that the wrong party had been sued.

The facts were exhaustively developed at trial and for present purposes need only be sketched in their essentials. In 1985, Sequoia (a conglomerate with diverse interests) conceived the idea of building an automated computerized voting machine. Unwilling (and unable) to fabricate parts and assemble a finished product, Sequoia jobbed components of the project to a number of vendors, among them Plastek, an IGC affiliate engaged in the molding and production of specialty plastics. Sequoia selected the villain of this piece, Moog Electronics, as the general contractor and assembler of the prototype voting machine (dubbed AVC–II). Sequoia also incautiously promised Moog the contract for the production model of the AVC–II.

Plastek built the molds and supplied Sequoia with the prototype parts. After working out some design kinks, Sequoia began production. Sequoia instructed Plastek to ship parts to Moog on Sequoia's account. Plastek did so, and for a while, things went swimmingly. Plastek shipped, Moog assembled, and Sequoia paid.

In late 1985, unbeknownst to Plastek, Sequoia began to doubt Moog's financial stability and capability.[1] Sequoia sought to replace Moog with another assembler, Momentum Technologies. Moog preemptively sued. Sequoia settled with Moog by promising Moog a 500 unit piece of the production contract. Sequoia insisted on a provision in the agreement protecting its interests if Moog were to declare bankruptcy. A companion provision protecting the AVC–II vendors went by the boards during the settlement negotiations. Plastek was told nothing of these events.

After settling the lawsuit, Sequoia redrew its billing instructions to Plastek. Where they had once read "sold to Sequoia, ship to Moog," they now said "sold to Moog, ship to Moog." Oblivious to the implications, Plastek dutifully followed Sequoia's directions. Moog filed for bankruptcy in early 1987. Eighty thousand dollars of debt owed to Plastek was unpaid. Sequoia disclaimed any responsibility.

Several conclusions can be drawn from the evidence that emerged at trial. First, Sequoia exploited its superior knowledge to shift a substantial portion of any risk of Moog's going bankrupt from itself to Plastek. The

---

1. Although when and if Sequoia learned that Moog was in shaky financial condition was disputed at trial, I credit Edmund Lonergan's (the Technical Director of the AVC–II project) testimony that he had become aware of that fact in late 1985 and had communicated it to James Larkin, Sequoia's Chief Financial Officer. Lonergan also testified that by early 1986 "everyone" in Sequoia's management was aware of the problems with Moog. Larkin acknowledged in his testimony that he knew that Moog was chronically short of cash. He in fact authorized a billing arrangement to enable Moog to borrow against AVC–II work in progress.

parts Moog purchased were proprietary to Sequoia and could only be sold by Plastek to companies that Sequoia designated (Moog and Momentum). In this sense, while it was under no legal obligation to follow Sequoia's directives, Plastek was Sequoia's captive to the extent that it had any anticipation of making a profit on the work that Sequoia had arranged. Second, Sequoia felt no obligation to share with Plastek any of the information that it had developed concerning Moog's viability. Sequoia did or said nothing that might have alerted Plastek to the fact that it had been maneuvered into extending credit to Moog. Third, Moog's relationship with Sequoia was anything but arm's length.[2] Moog had for all practical purposes been chosen by Sequoia as the general contractor for the AVC–II project. As David Adamson, Sequoia's President, made clear, Sequoia did not have the expertise to manage acquisition and payment of vendors, and expected Moog to perform those functions on its behalf. Fourth, and perhaps most significant, Plastek, lulled by Sequoia's blandishments and visions of lucre, looked to Sequoia to watch out for its interests. Plastek never attempted to deal with anyone at Moog, never inquired about Moog's creditworthiness, and awoke to the fact that it was sitting on a stack of unpaid bills only after Moog ceased doing business. It was then that Plastek, after entertaining extortionate thoughts about holding the molds as "collateral," reluctantly returned them to Sequoia and demanded that Sequoia pay Moog's bills.[3]

## THE THEORY OF THE CASE AND THE JURY VERDICT

With respect to its common law claim, Plastek proceeded on a theory of oral con-

tract, contending that Sequoia had lured Plastek into the deal (and complacency about the bills) with a verbal promise to pay for the "whole project." (There was evidence that Sequoia was well behind schedule in developing the AVC–II and ardently sought the benefit of Plastek's expertise). Sequoia, for its part, argued that its purchasing instructions were unambiguous in assigning responsibility for payment for the parts to Moog. Whether an unconditional promise to guarantee Moog's bills had been made by Sequoia rested on the testimony of Charles Lagasse, Plastek's President, specifically as to what had been said by David Adamson, Sequoia's President, at a meeting at Logan Airport in the fall of 1985.[4] The jury rejected Lagasse's version of the meeting and sided with Adamson. Other than this meeting, Plastek was hard pressed to point to anything that Sequoia had said or done that could have been construed as gainsaying the wording of Sequoia's purchasing directives.

Plastek's initial theory with respect to the Chapter 93A count derived from its contract claim. Plastek alleged a breach of the covenant of good faith and fair dealing that is implicit in any contractual arrangement. See *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 474, 583 N.E.2d 806 (1991). The case was put to the jury,[5] at the urging of both counsel, with the Chapter 93A count framed in more general terms as to whether Sequoia had engaged in unfair and deceptive acts by failing to disclose to Plastek what it knew about Moog's viability. The jury decided that Sequoia had acted unfairly.[6]

---

**2.** I disagree with Kenneth Allsop's (IGC's Treasurer) testimony on this issue. Allsop admitted that he had no personal knowledge of the arrangement between Sequoia and Moog.

**3.** Plastek carried the debt on its books as a Moog accounts receivable. Although a number of the invoices to Moog were well past ripe, Plastek's first explicit demand that Sequoia pay Moog's bills was made in early 1987.

**4.** Lagasse testified that Adamson had promised that Plastek would be paid for the "whole project" if it agreed to commit to the long haul. Adamson testified that he had done no more than

impress on Lagasse the importance of meeting the project's deadlines.

**5.** The jury was asked for an advisory opinion. The court indicated to counsel that, while it would not be bound by the jury's decision, it would give an advisory verdict great deference. See *Computer Systems Engineering, Inc. v. Qantel Corp.*, 571 F.Supp. 1365, 1373 (D.Mass.1983), aff'd, 740 F.2d 59 (1st Cir.1984).

**6.** The jury did not find that Sequoia had acted "deceptively." The jury further found that Sequoia's failure to disclose was not "willful." Finally, the jury was not persuaded that Sequoia's

■ A trial judge, who has reserved to himself a plaintiff's Chapter 93A claims, is not bound by a jury's findings on related common law claims or by the jury's advice on the disposition of the Chapter 93A claim. See *Spaulding v. Young,* 32 Mass.App.Ct. 624, 626 n. 2, 592 N.E.2d 1348 (1992). Sequoia understandably asks that the court reject the jury's finding in this case. Sequoia argues that absent a fiduciary relationship, no duty to disclose arises, and that no relationship of a fiduciary nature existed between Sequoia and Plastek. If this contention is correct, there can be no recovery under G.L. c. 93A, § 11. See *Greenery Rehabilitation Group v. Antaramian,* 36 Mass.App.Ct. 73, 78–79, 628 N.E.2d 1291 (1994).

The jury was instructed on this issue as follows:

A duty to ferret out and disclose information arises only where parties share a special relationship of trust. As a general rule, arm's length business transactions do not impose a duty on the participants to watch out for one another's interests. One party cannot unilaterally convert a business relationship into a fiduciary one merely by imposing trust and confidence on another party, blindly expecting that party to altruistically protect or promote its interests. The rule is different where one party exploits a position of trust and confidence to persuade or lull the other into surrendering control of its financial affairs. Whether the relationship between Sequoia and IGC/Plastek rose to the level of a fiduciary relationship, that is, whether Sequoia had taken on the mantle of a de facto trustee in its dealings with IGC, is an issue of fact for you to decide.

Even where a fiduciary relationship exists, the trustee has a duty only to disclose facts that it knows, or should have known. The trustee is under no duty to offer non-factual opinions, estimates or judgments. Nor can a trustee be held liable for failing to disclose facts that would have made no difference to the recipient of the disclosure. On the other hand, the deliberate failure by a trustee to disclose a fact that it knew, or should have known, in order to advance its own interest at the beneficiary's expense, or to absolve itself of responsibility for promises it had made, would constitute an unfair or deceptive act.

■ These instructions, I believe, are an accurate statement of the applicable law. See, e.g., *Heinrich v. Silvernail,* 23 Mass. App.Ct. 218, 225 n. 8, 500 N.E.2d 835 (1986). If anything, they may have been more favorable to the defendant than was required, as the cases seem to say that a common law duty to disclose may arise even outside a relationship that the law has traditionally recognized as a fiduciary one. See *Swinton v. Wittensville Sav. Bank,* 311 Mass. 677, 678–679, 42 N.E.2d 808 (1942) (a fiduciary relationship *or* a position of confidence and dependence between the parties); *Restatement of Torts (Second),* § 551(2)(a) (1976) (a fiduciary or *similar* relationship of trust and confidence). Cf. *Heller Financial v. Insurance Co. of North America,* 410 Mass. 400, 408, 573 N.E.2d 8 (1991) (surety had no legal or *ethical* duty to disclose). There may also be a duty to disclose under G.L. c. 93A, § 11, that is broader than the common law requirement, although the issue has not been decided by the Massachusetts Supreme Judicial Court. See Gilleran, *The Law of Chapter 93A,* § 4:10 (1989). Cf. *USM Corp. v. Arthur D. Little Systems, Inc.,* 28 Mass.App.Ct. 108, 124–126, 546 N.E.2d 888 (1989).

■ I believe that the jury was correct in its assessment that Sequoia had acted unfairly in failing to disclose to Plastek the fact that Moog was an unreliable customer. I further believe that the jury was correct in its assessment that Plastek was in a position of "trust and dependence" with respect to Sequoia. This was not the "arm's length" business transaction portrayed by Sequoia.[7]

revision of the billing instructions was an unfair and deceptive act.

**7.** Although both Sequoia and Plastek rely on Ken Allsopp's (IGC's Treasurer) testimony that the relationship between Sequoia and Plastek was "arm's length," the court is not bound by a witness's legal conclusions. Plastek's position appears to be motivated by a misunderstanding of the statement in *Newton v. Moffie,* 13 Mass. App.Ct. 462, 467, 434 N.E.2d 656 (1982), that Section 11 applies "only to dealings between legally separate 'persons' engaged in arm's length transactions." While Section 11 does not

Plastek did not solicit Sequoia's business. Sequoia sought out Plastek as part of an effort to rescue a failing project in which it had risked a substantial investment. Plastek did not own the molds for Sequoia's parts. They were proprietary to Sequoia. Plastek could only produce from them with Sequoia's permission. Plastek had no choice of customers. The selection was made by Sequoia. Under the circumstances, while Sequoia's relationship with Plastek may not have risen to that of a formal fiduciary status, it went well beyond that of the ordinary buyer and seller.[8]

Sequoia's aim was to relieve itself of all production responsibility for the AVC–II. Plastek had no stake in the overall success of the project other than the profit it expected to make on the parts it molded. Presumably Plastek would have been happy to ship parts anywhere Sequoia directed so long as there was some anticipation of payment. While it is true that a fiduciary or quasi-fiduciary relationship cannot be created unilaterally, it is not enough for Sequoia to say that it did not formally accede to a superior role. The outcome might be different had Sequoia done no more than to recommend Moog to Plastek as a potential customer. Sequoia, however, managed the entire transaction. Sequoia designated Moog as the general contractor. Sequoia generated the purchasing orders and effectively authored the contract between Plastek and Moog. Even more telling is the fact that Sequoia continued its relationship with Moog for no purpose other than to extricate itself from a legal imbroglio of its own making.[9] *Greenery Rehabilitation Group v. Antaramian,* supra, on which Sequoia relies, presents a distinguishable set of facts. *Greenery* was an arm's length transaction. The plaintiff in *Greenery* was free to reject the deal and the defaulting tenant. Plastek, having signed on to Sequoia's project, had no real choice but to ship to Moog on Sequoia's say-so. More significant, in *Greenery,* the evidence did not support an inference that the defendants knew at the time of the sale that the tenant was in danger of insolvency. Here there is overwhelming evidence that Sequoia knew of Moog's doubtful future when it redrafted the billing instructions to Plastek.

Although Sequoia takes the position that there is no credible evidence that Plastek would have behaved differently had Sequoia shared with Plastek its knowledge of Moog's financial instability (and consequently no showing of a causal connection between Sequoia's failure to disclose and the damage to Plastek), I find this proposition difficult to accept. Rather, I credit the testimony of James Lynam and Charles Lagasse that IGC/Plastek would never have agreed to mold the parts had it known that Sequoia was not to be the customer in fact.

Did Sequoia's conduct "attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce[?]" *Levings v. Forbes & Wallace, Inc.,* 8 Mass.App.Ct. 498, 504, 396 N.E.2d 149 (1979). While it is true that "[o]ne can easily imagine cases where an act might be unfair if practiced upon a commercial innocent yet would be common practice between two people engaged in business," *Spence v. Boston Edison Co.,* 390 Mass. 604, 616, 459 N.E.2d 80 (1983), the protections of Chapter 93A are not limited "to small, unsophisticated businesses." *V.S.H. Realty, Inc. v. Texaco, Inc.,* 757 F.2d 411, 418 (1st Cir.1985). Plastek, it can be said, was naive, inattentive, and altogether

---

apply to fiduciaries who are part of the same legal entity, for example, a partnership, "fiduciaries can deal with each other at arm's length and the trade or commerce requirement will be met." Gilleran, *The Law of Chapter 93A,* § 2:18 (1989). Cf. *Brown v. Gerstein,* 17 Mass.App.Ct. 558, 569–571, 460 N.E.2d 1043 (1984).

**8.** Sequoia's related argument, that it cannot be held liable for what it did not know, while a correct statement of law, is factually unsustaina-

ble. It is clear that by the end of 1985, Sequoia was aware that Moog was in a parlous condition. This knowledge went beyond mere opinion and "gut feeling;" it had a solid empirical basis.

**9.** Sequoia in fact was highly dissatisfied with the pace and quality of Moog's work and would not have continued any relationship with Moog but for its fear of being held to its promise to give Moog a sole source contract.

too trusting of Sequoia.[10]  Sequoia exploited that trust and attended to its own interests. "The courts are not invited by [Chapter 93A] to punish every departure from 'punctilio of an honor the most sensitive' but they may enforce standards of behavior measurably higher than perfidy.  They need not necessarily endorse a pattern of behavior because it happens to be current in the market place." *Doliner v. Brown,* 21 Mass.App.Ct. 692, 697, 489 N.E.2d 1036 (1986).

Because I agree with the jury that Sequoia acted unfairly, I will award Plastek damages in the amount of the unpaid invoices.  (The amount—$80,100.49—is not in dispute).  I also conclude that an award of multiple damages is not called for in this case.  Chapter 93A creates two classes of defendants: (1) those whose violations are relatively innocent; and (2) those whose violations are "willful and knowing."  It is this latter class of defendants, whose conduct is egregious or meretricious, that the law subjects to multiple damages.  See *International Fidelity Ins. Co. v. Wilson,* 387 Mass. 841, 853, 443 N.E.2d 1308 (1983); *Bachman v. Parkin,* 19 Mass.App.Ct. 908, 909, 471 N.E.2d 759 (1984).  The punitive damages provision of Section 11 "is directed against callous and intentional violations of the law." *Heller v. Silverbranch Construction Corp.,* 376 Mass. 621, 627, 382 N.E.2d 1065 (1978). See also *Briggs v. Carol Cars, Inc.,* 407 Mass. 391, 396–397, 553 N.E.2d 930 (1990) (the statute comprehends acts done with a reckless disregard for whether one's acts are unfair or deceptive).  On the other hand, an act may be "unfair" for purposes of the statute and yet not so callous as to merit a punitive award.  See *Service Publications, Inc. v. Goverman,* 396 Mass. 567, 578, 487 N.E.2d 520 (1986).  Sequoia's practices were sharp and "knowing" in the sense that they were meant to take advantage of Plastek's inferior position, but they were not "willful"

in the sense that Sequoia knew or intended them to be callous or deceptive.  The jury agreed, and I have no reason to conclude otherwise.[11]

Having prevailed on the 93A claim, plaintiff is entitled to an award of reasonable attorney's fees and costs.  See *Datacomm Interface, Inc. v. Computerworld, Inc.,* 396 Mass. 760, 780, 489 N.E.2d 185 (1986).  What is a "reasonable fee" is in the discretion of the court.  The relevant factors to consider are "the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation and ability of the attorney, the usual price charged for similar services by other attorneys in the same area, and the amount of awards in similar cases." *Linthicum v. Archambault,* 379 Mass. 381, 388, 398 N.E.2d 482 (1979).  For services to be compensable under Chapter 93A, there must be a relationship "between the depth of the services provided and what is at stake." *Morse v. Mutual Federal Savings & Loan Association,* 536 F.Supp. 1271, 1283 (D.Mass.1982).  See also *Hanner v. Classic Auto Body, Inc.,* 10 Mass.App.Ct. 121, 123–124, 406 N.E.2d 686 (1980).  As a rule, where a single chain of events gives rise to both a common law and a Chapter 93A claim, apportionment of legal effort between the two claims is not necessary. *Simon v. Solomon,* 385 Mass. 91, 111–112, 431 N.E.2d 556 (1982).  However, effort expended on an unsuccessful common law claim brought in concert with a successful Chapter 93A claim should not be compensated. *Morse,* supra at 1282.

As the trial judge, I am familiar with what transpired at trial.  I have reviewed the pretrial record of the case.  I have also examined the affidavit and supporting documents submitted by plaintiff's counsel.

---

10. Some of this complacency may be attributed to the fact that Sequoia and IGC were not strangers to one another.  Sequoia, prior to these events, had explored IGC as a possible acquisition.  It was knowledge gained from these discussions that led one of Sequoia's principals to recommend Plastek as a solution to Sequoia's problems with the AVC–II project.

11. Plaintiff in its brief concedes that the facts of the case do not support an award of multiple damages.

From these sources and from the criteria suggested in *Linthicum,* supra, I have determined an attorney's fee which I believe to be objectively reasonable.[12]

[REDACTED] In structuring this award, I have considered among other factors the following. The case was relatively straightforward, involving a simple breach of contract. It presented no novel legal issues or complex facts. The case was nonetheless disturbingly over-lawyered. Plaintiff has asked to be reimbursed $115,000 in legal fees and disbursements.[13] I question the judgment that caused lawyer and client to expend $115,000 in pursuit of damages which from the beginning were known to total only $80,000. In calculating an award of attorney's fees I have discounted certain work that I consider solely related to the failed breach of contract claim, and other work that I consider duplicative and unnecessary. I have also taken into consideration the fact that the plaintiff's success in this case was not large, and might have been no success at all but for a tactical error on defendant's part in agreeing to sever plaintiff's Chapter 93A claim from its contractual roots. In sum, I consider an award of attorney's fees and costs in the amount $18,866.50 to be fair and reasonable under the circumstances.[14]

### ORDER

Judgment shall enter as follows:

1. On the claim of breach of contract, the plaintiff shall take nothing;

2. On the violation of G.L. c. 93A, judgment shall enter for the plaintiff in the amount of $80,100.69 with interest from the date of the filing of this action;

---

12. If the judge awarding fees and costs is the same judge before whom the case was tried, no evidentiary hearing need be held as to the reasonableness of the fee requested. *Heller,* supra 376 Mass. at 630–631, 382 N.E.2d 1065.

13. According to counsel's affidavit, IGC/Plastek has already paid $101,844.92 although that may be in error, as only one payment of $15,000 by Plastek appears in the record.

3. Attorney's fees and costs are to be awarded to the plaintiff in the amount of $18,666.50.

SO ORDERED.

---

14. On a related matter, I agree with defendant that plaintiff's Chapter 93A count as submitted to the jury sounds in tort rather than contract. Interest, therefore, on the underlying award will be paid from the date of the filing of the action. See G.L. c. 231, § 6B. There is no prejudgment interest on attorney's fees. *International Totalizing Systems, Inc. v. PepsiCo, Inc.,* 29 Mass.App. Ct. 424, 437, 560 N.E.2d 749 (1990).