SCOTT LANGTON *vs.* DAVID A. LABRECQUE & another[1]
(and two consolidated cases[2]).

No. 87-529.

Essex. January 14, 1988. — March 11, 1988.

Present: ARMSTRONG, KAPLAN, & WARNER, JJ.

*Consumer Protection Act*, Sale of condominium unit, Consumer, Unfair act or practice. *Contract*, Sale of real estate, Promissory estoppel. *Estoppel*. *Practice, Civil*, Summary judgment.

In consolidated actions by three prospective buyers of condominium units against the sellers, the owner-developers of a condominium project, in which the buyers asserted claims under G. L. c. 93A, §§ 2, 9, for unfair and deceptive practice on the part of the sellers in terminating certain unit "reservations" held by the buyers, summary judgment in favor of the sellers was inappropriate, where materials before the judge, including evidence of conduct and circumstances beyond the four corners of reservation receipts executed by the parties, disclosed facts together with unresolved issues of fact entitling the buyers to go to trial on the basis of "oppressive" or "unscrupulous" conduct by the sellers amounting to promissory estoppel or unfairness. [467-469]

CIVIL ACTIONS commenced in the Superior Court Department on July 24, 1986.

The cases were heard by *Katherine Liacos Izzo*, J., on a motion for summary judgment.

*William Coniaris* for Scott Langton & others.
*Douglas W. Resnick* for the defendants.

KAPLAN, J. These are consolidated actions by three buyers of condominium units against the sellers, the owner-developers of the Franklin Crossing Condominiums Project in Franklin.

---

[1] Jeffrey S. Fermon. Fermon and LaBrecque are the general partners of Nashua Investors II Limited Partnership.

[2] Actions by Alan Shah and Wayne Douglas against the same defendants.

The plaintiffs assert claims under the Consumer Protection Act, G. L. c. 93A, §§ 2, 9, for unfair and deceptive practice on the part of the sellers in terminating the "reservations" held by these buyers. A judge of the Superior Court allowed the sellers' motion for summary judgment dismissing the complaints. We reverse the judgment on the ground that the record made discloses facts together with unresolved issues of fact entitling the buyers to go to trial on the basis of "oppressive" or "unscrupulous" conduct amounting to promissory estoppel or lying within the "penumbra of . . . [that] common-law . . . concept of unfairness."[3]

We deal with Scott Langton's case and mention below (notes 5-8) the variant cases of Alan Shah and Wayne Douglas. On November 19, 1985, at a time when the "Phase Two" project premises were still in preparation, Langton and the sellers, by Joanne L. Cyr, manager, executed a "Receipt for Unit Reservation Deposit." This reserved for Langton unit 12 of building 10 of Phase Two at a stated purchase price of $92,900. Under the instrument, which by its terms was to be accompanied with an unexecuted purchase and sale agreement and a copy of the master deed, Langton paid $1,000 to the sellers as a "deposit." If Langton desired to close the purchase, he was to return the agreement, executed by him, by February 1, 1986, together with the further down payment that would be called for in the agreement. If he did not so desire, he must by the same date return to the sellers the unexecuted agreement; if he did not return the document, he forfeited the $1,000. On their part, the sellers retained the right to withdraw from the transaction

---

[3] See the derivation of the quoted words in relation to the Consumer Protection Act as shown in *PMP Associates, Inc.* v. *Globe Newspaper Co.*, 366 Mass. 593, 596 (1975).

We speak of promissory estoppel for familiarity's sake although it would be more exact to refer to the section 90 principle as it appears in Restatement (Second) of Contracts (1981). See *Loranger Constr. Corp.* v. *E.F. Hauserman Co.*, 376 Mass. 757, 760-761 (1978); *McAndrew* v. *School Comm. of Cambridge*, 20 Mass. App. Ct. 356, 364 n.11 (1985).

at any time before they executed the agreement, being obliged to return the $1,000, but without interest.[4]

Subsequent events must be pieced out of the pleadings, answers to cross interrogatories on behalf of the parties, and a short affidavit by a member of the sellers' partnership. It appears that Langton either was not furnished with any purchase and sale agreement to accompany the reservation instrument or received only a "specimen" agreement, presumably not suitable in its content for execution by him; there is no indication that he was furnished with the master deed.

The sellers, besides seeking to stand on the terms of the reservation receipt, indicate in their submission on summary judgment that the termination of which Langton complains occurred because of a suspicion that Langton was coming in as an investor rather than an intending occupant. The sellers were apprehensive on that score, they say, because, according to the financing plan under which they were operating, not more than 30% of the Phase One and Phase Two units could be sold to investors. Some units in Phase One, they say, had been sold to persons, some of them related to Langton, who did not become occupants.[5] The sellers state that Langton was told of the financing restriction when he signed the reservation receipt.

---

[4] "Seller reserves the right to refund to Prospective Buyer the Reservation deposit at any time prior to the execution of the Unit Purchase and Sale Agreement by Prospective Buyer and by Seller. In the event such deposit is either so refunded or so forfeited, neither Prospective Buyer nor Seller shall have any further obligation or rights whatsoever hereunder."

The instrument also stated that seller was not to be bound by representations except such as were made by seller in writing. This of course was subject to change or supersession like any other contract term. See *First Pa. Mortgage Trust* v. *Dorchester Sav. Bank*, 395 Mass. 614, 625 (1985); *National Medical Care, Inc.* v. *Zigelbaum*, 18 Mass. App. Ct. 570, 578 n.7 (1984); Farnsworth, Contracts § 7.6, at 475 (1982), citing Cardozo, J., in *Beatty* v. *Guggenheim Exportation Co.*, 225 N.Y. 380, 387 (1919).

[5] Of the 36 units in Phase One, it seems 17 wound up in the hands of investors whom the sellers had believed to be intending occupants. No mention is made of sales to persons known to be investors. No units in Phase Two, totaling 60 units, were sold to investors. It is not shown on this record that sales to Langton (even if regarded as an investor) and Shah and Douglas would have brought the percentage of investors in the two Phases over 30%. Phase Three was to add an additional 60 units.

To the contrary, Langton says the only time he recalls discussing owner occupancy was about December 4, 1985, with Cyr, and that was in the following connection. Cyr told him on November 22, 1985, that, for buyers who individually chose to borrow from a particular bank named by the sellers (Boston Five Cents Savings Bank), the sellers were undertaking to assume part of the expense of closing. Cyr said she would set up an appointment for him with the bank and gave him a paper with financing data. On December 4, 1985, Langton spoke again with Cyr. She told him then, in effect, that if he intended to take advantage of the Boston Five financing, he must be the occupant of his unit. Langton assured Cyr that he intended to occupy his unit.[6]

According to Langton, as the February date approached, he got in touch with Cyr and inquired about securing an agreement for execution and getting on with the transaction. He was assured, he says, that the February 1 date was not important; the sellers preferred to have the agreement signed nearer the date when the premises would actually be ready, so that extensions of the terms of the agreement could be avoided. In fact, the sellers' answer to an interrogatory indicates that all but one of the sixty units of Phase Two under reservation receipts were sold by purchase and sale agreements that were signed after the reservation periods expired.

The sellers of course were not in a position to retain Langton's deposit for his failure to return an unexecuted purchase and sale agreement by February 1. That date passed and it was not until March 10, 1986, that the sellers wrote to Langton terminating the reservation receipt and refunding the $1,000 without interest. Langton got in touch with a person apparently representing the sellers and protested the termina-

---

[6] The sellers say Shah represented, before signing the reservation receipt, that he would occupy the unit. Shah says he never intended to do so and the matter was never discussed with him. The sellers say Douglas was told of the restriction and he said he would occupy, but Douglas says he made no such statement, and occupancy was not discussed. Both Shah and Douglas called before the expiration of the reservation period to inquire about closing and were told to await a call to come in and execute the purchase and sale agreements.

tion. She said there must be some mistake; fortunately the unit was still unsold; she wrote Langton's name in the space on a layout representing unit 12. Langton also communicated by telephone with David A. LaBrecque, one of the general partners of the selling partnership. When LaBrecque mentioned the question of occupancy, Langton said he was prepared to sign a paper undertaking to occupy. LaBrecque said the reason Langton's reservation was terminated was that he, LaBrecque, didn't want to have anything to do with Langton's attorney, and he was cancelling any buyers who were his clients.[7]

After the termination, the sellers sold unit 12 to David and William Vellante for a price of $107,900, an advance of $15,000 over Langton's stated purchase price.[8]

Langton's position was, in effect, that he had been led by the sellers or their agents to believe, and did believe, that the passing of the expiration period would not prejudice him; that a purchase and sale agreement would be forthcoming and the sale concluded at the stated price; and that he suffered damage through reliance on such express or implied representations because (among other possible elements of damage) the prices of this and like condominium units rose during the period. Langton says any reason assigned by the sellers for the termination was a pretext.

In our opinion, whether the facts were as Langton claimed and whether he entertained or reasonably entertained his asserted belief were disputed issues for trial. The judge below simply referred to the terms of the reservation receipt. But conduct and circumstances beyond the four corners of that instrument could fairly raise issues of estoppel and unfairness. The judge also said, "[N]o demand appears to have been made by plaintiffs for the execution of purchase and sale agreements prior to February 1, 1986." Langton's conduct as he set it forth was quite to the contrary.

---

[7] Shah and Douglas evidently were also clients of this attorney.

[8] Shah's unit was to cost him $95,900; it sold for $115,900. Douglas was to pay $92,900; it was offered for $112,900 (the record does not disclose whether it was sold).

The trier will face the question, was this a situation merely of unfinished negotiations between the parties, or was there a firmer expectation and justifiable reliance or some cognate equity?

A polar case of the former type was *Pappas Industrial Parks, Inc.* v. *Psarros*, 24 Mass. App. Ct. 596 (1987), where the parties, experienced real estate dealers, entered into negotiations for an exchange of parcels. The negotiations fell through. A c. 93A claim failed: "Every deal that goes sour does not give rise to a c. 93A claim." *Id.* at 600. Comparable situations appeared in *Tull* v. *Mister Donut Dev. Corp.*, 7 Mass. App. Ct. 626 (1979); *Zayre Corp.* v. *Computer Syss. of America, Inc.*, 24 Mass. App. 559 (1987). Cf. *Doliner* v. *Brown*, 21 Mass. App. Ct. 692 (1986).

Of the other, contrasting type, a clear instance was *Greenstein* v. *Flatley*, 19 Mass. App. Ct. 351 (1985). The parties had agreed on all material terms of a commercial lease, and the intending lessee had signed the document and returned it to the lessor's agent. The agent assured the lessee that execution of the lease by his principal was a mere formality. After the lessee acted in reliance, the lessor informed the lessee that the space had been rented to another. The lessee secured a c. 93A recovery. In various degrees similar were the cases of *Cellucci* v. *Sun Oil Co.*, 2 Mass. App. Ct. 722 (1974), *Loranger Constr. Corp.* v. *E. F. Hauserman Co.*, 6 Mass. App. Ct. 152, *S.C.*, 376 Mass. 757 (1978), and *Wasserman* v. *Agnastopoulos*, 22 Mass. App. Ct. 672 (1986).[9]

It remains to be seen where, at trial, the present cases will appear on a continuum from one type to the other. "Whether

---

[9] We observe that of the cases cited in the two preceding paragraphs of our text, only the *Pappas* case was decided on motion for summary judgment; the rest went to trial. The present situation is one of those where the "submitted materials [on motion for summary judgment] render necessary further exploration of the significant facts and a decision of these 'state of mind' issues by a trier of fact who has heard and evaluated all relevant evidence." *Quincy Mutual Fire Ins. Co.* v. *Abernathy*, 393 Mass. 81, 86 (1984). See also *Sheehy* v. *Lipton Indus., Inc.*, 24 Mass. App. Ct. 188, 196 (1987).

[the sellers'] conduct was unfair is a matter of fact, however, and the [buyers] should have a chance to prove [their] claim." *Spence* v. *Boston Edison Co.*, 390 Mass. 604, 616 (1983). Here we need to add that these are consumers' actions under c. 93A, § 9 (as the parties appear to agree),[10] not actions under § 11 between businessmen. The buyers will indeed be held to solid proof. Still, "[o]ne can easily imagine cases where an act might be unfair if practiced upon a commercial innocent yet would be common practice between two people engaged in business." *Spence* at 616. Of course we venture no opinion on how the present case should or will come out.

*Judgment reversed.*

---

[10] Both the demand letters and the letters of refusal referred to § 9.