Butler, J.
This is an action for breach of contract, deceit and violation of Chapter 93A arising out of post-foreclosure conduct by a mortgagee. The case was tried, without jury, on September 7, 2000.
Based upon the credible testimony, exhibits and reasonable inferences drawn therefrom, the Court makes the following findings of fact.
FINDINGS OF FACT
On July 7, 1989 Mark Mitchell (“Mitchell”) obtained a loan from The Money Store Massachusetts, Inc. (“The Money Store”)[1] in the original amount of $53,800.00. The loan, secured by a mortgage from the Money Store to Mitchell on residential property located at 96 Winifred Avenue, Worcester, was evidenced by a fifteen-year promissory note of the same date in the amount of $53,800.00.[2] The note bore interest at a rate of 13.5%. The mortgage, containing a statutory power of sale, was recorded at Book 12208, Page 101 with the Worcester Comity Registry of Deeds.
At all times relevant and material to the events occurring in this action The Money Store was engaged in trade and commerce as defined by Massachusetts General Laws Chapter 93A, et seq.
Subsequently, Mitchell was in breach and in default of the terms and conditions of the note and mortgage. The Money Store, pursuant to the statutory power of sale contained in the mortgage, arranged and, on November 24, 1992, conducted a mortgage foreclosure sale on the property. At this foreclosure sale, Mitchell was the high and successful bidder having tendered a bid in the amount of $60,000.00.[3] The second high bidder at the foreclosure sale was The Money Store with a bid in the amount of $59,000.00.
At the conclusion of the foreclosure sale, after the high bid of $60,000.00 submitted by Mitchell was accepted by the auctioneer, Mitchell tendered the required deposit of $5,000.00 to the representative of The Money Store. Chesley Oriel, attorney for The Money Store, held a clipboard containing three duplicates of a Purchase and Sale Agreement (“P&S Agree *349 ment”). Mitchell signed all three copies of the Agreement which, in part, required that the balance of the purchase price, $55,000.00, be tendered in cash or current funds to the attorneys representing The Money Store by 2:00 p.m. on December 24, 1992. There were no other signatures on the documents at the time Mitchell signed them. Mitchell requested a copy of the Agreement, but he was not given one. Instead, Attorney Oriel told him that the documents would be taken to his office for processing and would be forwarded to him promptly.
The Agreement stipulated that time was of the essence. It also provided that if the buyer were to default in completing the transaction, he would forfeit the deposit and be responsible for all resulting losses sustained by the seller, including reasonable attorneys fees. The Agreement had no corresponding provision for remedies in the event of seller’s default.
Mitchell also requested a receipt for his five thousand dollar deposit when he signed the P&S Agreement on November 24, 1992.[4] He was not given a receipt: he was told by Attorney Oriel that the copy of the P&S Agreement, reflecting the cash deposit, would serve as his receipt and that it would follow by mail. When the foreclosure was over, The Money Store representative left. Mitchell remained at his house, with no record of what had transpired and no receipt for the cash deposit.
The Court fully credits the testimony of Henry Raphaelson, an experienced real estate attorney. Attorney Raphaelson has represented many lending institutions in foreclosure proceedings. The practice in the industry is to provide the successful bidder at a foreclosure sale with a copy of the P&S Agreement which is signed by the auctioneer, seller and buyer. This is done not only for common sense reasons, but also to comply with the Statute of Frauds. It is in the lender’s interest to provide the buyer with a copy of the agreement.
Over the course of the following weeks, Mitchell telephoned The Money Store to request a copy of the P&S Agreement. He was repeatedly told that the P&S Agreement would be mailed to him. Mitchell relied on these statements, and on the original representation by Attorney Oriel that he would soon receive the P&S Agreement. Mitchell made some preliminary inquiries about financing, but could not proceed without a copy of the P&S Agreement. Mitchell believed that he could not obtain financing without a copy of the P&S Agreement.
On or about December 23,1992, Mitchell called The Money Store again. The closing was scheduled for the following day. In this telephone call, George Pitter, an authorized employee of The Money Store, extended the time period within which Mitchell was required to tender the balance of the purchase price for a period of approximately thirty (30) days, or until January 24, 1993.[5] During this conversation, Mitchell again mentioned that he had not received a copy of the Agreement, and offered to drive to Framingham to pick up the Agreement. Pitter informed Mitchell that Attorney Oriel had the P&S Agreement and would mail it to him. Neither Mitchell nor The Money Store telephoned or wrote to the other confirming this extension.
Apparently unaware of the oral extension, Attorney Oriel wrote Mitchell a letter dated January 7, 1993. This letter claimed that Mitchell breached the Agreement by not closing by December 23, 1992. Attorney Oriel stated that The Money Store would retain the deposit, and informed Mitchell that he must vacate the property or face eviction proceedings. Attached to this letter was a copy of the P&S Agreement, dated November 24, 1992. Thus, for the first time, on or about January 7, 1993, Mitchell received a copy of the P&S Agreement.
Mitchell failed to tender the balance of the payment due, i.e. $55,000.00, before January 24, 1993. He apparently gave up on any effort to obtain financing in view of The Money Store’s position that he was in breach. He did not telephone or write to The Money Store between January 7 and January 24, 1993. The Money Store never contacted Mitchell, either, to rectify its mistake in not honoring the extension.
Mitchell would not have given The Money Store $5,000 had he known that the P&S Agreement would not be sent to him promptly, in time to seek financing. Mitchell would not have signed the P&S Agreement had he known that he would not receive a copy of it until January 7, 1993, after the original closing date.
The Money Store did wait until after January 24, 1993 to arrange for the execution and recording of its foreclosure deed. On January 28, 1993, The Money Store executed a Mortgagee’s Deed and Affidavit conveying title to the property to itself as the second high bidder at the foreclosure sale, and .the Mortgagee’s Deed and Affidavit were thereafter recorded at the Worcester County Registry of Deeds on February 1, 1993. Months later, after evicting Mitchell, The Money Store conveyed the property to Threver T. Spence by deed dated December 22, 1993 for consideration of $59,900.00.
The Court does not credit the testimony of Henry Plaud, a real estate appraiser, who testified that the fair market value of the property was $101,000.00. Plaud’s appraisal was performed on July 30, 1996, almost three years following the foreclosure sale. He was unable to enter the house and thus had no basis on which to assess the condition of the interior of the house. More significantly, Plaud was uncertain as to whether he knew of the property’s sale in December 1993 to a third party for $59,900. Plaud’s testimony that the sale price in December 1993 was irrelevant to his opinion of fair market value, and his further observation that he would have to assume something “abnormal” was present in that sale, undermined his credibility.
*350 By letter dated July 5, 1995 Mitchell, through his attorney, served a written demand for relief (to which there was attached the letter from the attorney representing The Money Store dated January 7, 1993) in accordance with the provisions of Massachusetts General Laws Chapter 93A Section 1 et. seq. upon The Money Store. By letter dated July 20, 1995, The Money Store, through its attorney, made a timely response to said written demand for relief by offering as settlement payment in the amount of $2,500 to Mitchell.
RULINGS OF LAW
Relief under G.L.c. 93A.
The Consumer Protection Act, G.L.c. 93A, enacted by St. 1967, c. 813, §1, provides in pertinent part: “(u)nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.” G.L. 93A, §2(a). The statute is designed “to ensure an equitable relationship between consumers and persons engaged in business.” Heller v. Silverbranch Construction Corp., 376 Mass. 621, 624 (1978); see also Linkage Corporation v. Trustees of Boston University, 425 Mass. 1, 25 (1997) (Chapter 93A designed “to encourage more equitable behavior in the marketplace . . . [and impose] liability on persons seeking to profit from unfair practices”).
Because there is no statutory definition for “unfair or deceptive acts or practices,” courts often look to federal case law to determine whether conduct falls within the scope of Chapter 93A. See G.L.c. 93A, §2(a) (citing Federal Trade Commission Act, 15 U.S.C. §45(a)(l)); Purity Supreme, Inc. v. Attorney Gen., 380 Mass. 762, 771 (1980). Additionally, the Consumer Protection Division of the Office of the Attorney General promulgated detailed regulations to determine when conduct involves unfair or deceptive acts or practices. See 940 Code Mass.Regs. 3.16.[6] Essentially, a practice is unfair if it is “within . . . the penumbra of some common-law, statutory, or other established concept of unfairness ... is immoral, unethical, oppressive, or unscrupulous, [and] . . . causes substantial injury to [another].” PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975).
Unfairness under the statute is to be determined from all the circumstances. Duclersaint v. Federal National Mortgage, 427 Mass. 809, 814 (1998). “Whether conduct falls within the scope of c. 93A is a question answered on the circumstances of the individual case.” Dowd v. Iantosca, 27 Mass.App.Ct. 325, 326 (1989) (citing Spence v. Boston Edison Co., 390 Mass. 604, 616 (1983)); see also Langton v. Labrecque, 25 Mass.App.Ct. 463, 469 (1988) (“Whether [the sellers’] conduct was unfair is a matter of fact, however, and the [buyers] should have a chance to prove [their] claim”) (quoting Spence, 390 Mass, at 616). Factors examined include, but are not limited to, the following: (1) nature of conduct; (2) parties’ motives; (3) parties’ interests (4) social interest in weighing parties’ freedom to act versus contractual obligations; (5) relations between the parties. See Dowd v. Iantosca, 27 Mass.App.Ct. 325, 334 n.6 (1989).
Moreover, no intention to deceive need be shown for an act to qualify as deceptive under G.L.c. 93A. Swanson v. Bankers Life Co. 389 Mass. 345, 349 (1983); Linthicum v. Archambault, 379 Mass. 381, 388 (1979). For example, in Fraser Eng’g Co., Inc. v. Desmond, 26 Mass.App.Ct. 99 (1988), the Appeals court found no error in judge’s conclusion “that the defendant, in giving and failing to carry through on his assurance, committed a deceptive act within the meaning of G.L.c. 93A, Secs. 2(a) and 11.” Id. at 104 (holding that refusal to pay a debt from certain expected insurance proceeds after promising to do so is an unfair act where the promise caused someone to act differently than he or she otherwise would have). The Court explained, “an act or practice can be deceptive within the meaning of either of those sections [93A, §2(a) and §11] if it ‘[can] reasonably be-found to have caused a person to act differently from the way he otherwise would have acted.’ ” Id. (quoting Lowell Gas Co. v. Attorney Gen., 377 Mass. 37, 51 (1979)).
Additionally, there must be a causal relationship between the unfair act or misrepresentation and plaintiffs injury. See id. (citing cases); Kohl v. Silver Lake Motors, Inc., 369 Mass. 795, 800-01 (1976); Glickman v. Brown, 21 Mass.App.Ct. 229, 236 (1985). Actual reliance is not required; rather, if the act causes a person to “act differently,” this requirement is satisfied. Grossman v. Waltham Chemical Co. 14 Mass.App.Ct. 932, 933 (1982) (quoting Lowell Gas Co., 377 Mass, at 51).
Case law that has developed in Massachusetts involving allegedly unfair negotiation practices is instructive. Often, where there is a “pattern of conduct by one side which has dangled the other side on a string,” a 93A violation is found. Pappas Indus. Park, Inc. v. Psarros, 24 Mass.App.Ct. 596, 598 (1987); Langton, 25 Mass.App.Ct. at 469 (93A claim reinstated where factual questions existed as to whether consumer had been repeatedly assured that submitting his purchase and sale agreement past the deadline would not prejudice him).
Similarly, The Money Store’s repeated promises to provide Mitchell with a copy of the executed P&S Agreement “strung plaintiff along” and prevented him from obtaining financing to complete the sale. The following factors demonstrate that The Money Store’s actions were willful: defendant’s superior knowledge with respect to foreclosure sales; its knowledge of plaintiffs indebtedness; its failure to follow a standard industry practice of providing a copy of the signed P&S Agreement to the high bidder at the foreclosure sale; its continued refusal to provide same upon direct requests; its knowledge that Mitchell’s default would result in title passing directly to The Money Store; and *351 its intention to keep Mitchell’s $5,000 deposit. Clearly, defendant’s pattern of unfair behavior, directly hindering the manner and time of performance under the P&S Agreement, violated its general duty of good faith and fair dealing in conducting foreclosure sales.
First, the Money Store, being represented by Attorney Oriel, was in a better bargaining position than Mitchell. Attorney Oriel was in the business of conducting foreclosure sales. Mitchell, on the other hand, deeply in debt, simply wanted to keep his home. Not providing Mitchell with a copy of the executed P&S Agreement created superior rights to only one of the parties to the deal, namely The Money Store. “One can easily imagine cases where an act might be unfair if practiced upon a commercial innocent yet would be common practice between two people engaged in business.” Langton, 25 Mass.App.Ct. at 469 (quoting Spence, 390 Mass, at 616). Here, Mitchell is exactly the type of “innocent” that c. 93A was designed to protect.
Moreover, the standard practice within the foreclosure sale industry is to provide the successful bidder with a copy of the signed P&S Agreement at the time of the foreclosure sale. The Money Store was unfair in accepting a cash deposit without providing a receipt and in requiring Mitchell to sign legal documents without simultaneously providing him with a copy of same, despite the industry’s standard practice to do so. At the foreclosure sale on November 24, 1992, Attorney Oriel promised that a copy of the P&S Agreement would “promptly” follow by mail. Then, upon further telephone inquiries, representatives of The Money Store again assured Mitchell that the P&S Agreement would follow by mail. Still again, on December 23, 1992, an employee of The Money Store, George Pitter, did the same by telephone. In fact, during the December 23, 1992 communication, Mitchell offered to drive from Worcester to Framingham to personally pick up a copy of the P&S Agreement, but was told Attorney Oriel would send it by mail. Mitchell reasonably relied on all of these representations. Mitchell would not have given The Money Store $5,000 or signed the P&S Agreement had he known it would not be sent to him in time to obtain financing.
As a lending institution, the Money Store would have been aware of the need for a P&S Agreement to secure financing. Knowing Mitchell’s precarious financial situation and that The Money Store was the second high bidder, the Money Store refused to provide Mitchell with a copy of the P&S Agreement to prevent completion of the sale. Any claim that defendant’s actions were inadvertent is belied by The Money Store’s continued failure to provide a copy of the executed P&S Agreement despite numerous phone calls requesting that it be mailed as promised and Mitchell’s offer to pick it up. In fact, The Money Store allowed an entire month to elapse without responding to Mitchell’s simple request; letting the original closing date of December 24, 1992 pass without sending a copy of the executed P&S Agreement to him by mail. The Money Store was able to provide a copy of the P&S Agreement when it attached a copy of it to the January 7, 1993 letter advising Mitchell that he was in breach. Causing Mitchell to default enabled The Money Store to recoup its purchase money and keep the $5,000.00 deposit. Its conduct, in essence, is an unfair debt collection practice.
The Money Store was deceptive in promising to send Mitchell a copy of the P&S Agreement and then failing to do so. Mitchell reasonably relied on those representations; Clearly, the Money Store’s own wrongful acts prevented Mitchell from proceeding with his efforts to obtain financing. The Money Store’s actions were unscrupulous, unfair, oppressive and in violation of G.L.c. 93A.[7]
Damages
A plaintiff may bring concurrent claims for recovery in addition to a G.L.c. 93A claim. Green v. Blue Cross and Blue Shield of Massachusetts, Inc., 47 Mass.App.Ct. 443, 449 (1999). Where damages are awarded under G.L.c. 93A on facts intended to support concurrent claims for damages under other theories, recovery under the other claims would be duplicative. Wolfberg v. Hunter, 385 Mass. 390, 401 (1982); see also Green, 47 Mass.App.Ct. 449 (where defendant committed a breach of its duty of good faith and fair dealing under G.L.c. 93A, the court did not reach the plaintiffs claims for breach of contract and misrepresentation as it would be duplicative).
Money damages may be recovered only for the actual damage caused by the alleged unfair or deceptive trade practice, including all losses that were the foreseeable consequence of the defendant’s unfair or deceptive act or practice. DiMarzo v. American Mut. Ins. Co., 389 Mass. 85, 101 (1983). The proper measure of damages for a Chapter 93A violation is “the loss causally connected to those acts which were found to be unfair and deceptive.” Multi Technology, Inc. v. Mitchell Management Systems, Inc., 25 Mass.App.Ct. 333, 337 (1988); see also Cohen v. Liberty Mutual Ins. Co., 41 Mass.App.Ct. 748, 755 (1996) (“a causal connection between the defendant’s wrongdoing and the resulting damages is still a part of c. 93A calculus”).
Section 9(3) of c. 93A provides, in pertinent part:
[T]he amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence ... In addition, the court shall award such other equitable relief, including an injunction, as it deems to be necessary and proper.
G.L.c. 93A, §9(3), as amended by St. 1989, c. 580. The statute distinguishes between actual and equitable damages. “It is beyond question that rescission is an equitable remedy,” thus, actual damages subject to *352 multiplication under 93A “consist of the losses suffered by the plaintiff because of the interruption in the status quo.” Schwartz v. Rose, 418 Mass. 41, 48 (1994) (money refunded to purchaser was not subject to multiple assessment under 93A, however, amount of interest that purchaser lost between closing and date of recission trebled).
Keeping in mind that duplicative damages are not permitted and recission damages are not subject to multiplication, the court rules as follows with respect to damages. See Chamberlayne School v. Banker, 30 Mass.App.Ct. 346, 353 (1991) (citing cases). First, actual damages are those losses which were the foreseeable consequence of The Money Store’s unfair conduct. Here, withholding a copy of the executed P&S Agreement may have prevented Mitchell from obtaining financing to keep his home. Notwithstanding the Money Store’s unfair conduct, it is only speculative to assume that Mitchell would have been able to close on the sale.[8] Furthermore, Mitchell failed to provide any credible evidence of his actual damages upon the Money Store’s breach of the P&S Agreement, other than the loss of his deposit. Absent evidence concerning the property’s fair market value at the time of the foreclosure sale, it is impossible to evaluate the equity to be recouped had performance under the contract occurred. The only credible evidence with respect to the value of the property is that in 1993 it was sold to a third party for $59,900.00.
Therefore, under either contract law or G.L.c. 93A, Mitchell is only entitled to have his deposit in the amount of $5,000.00 returned, with statutory interest on that amount from November 24, 1992, to the date of entry of judgment. In addition to compensation for the loss of the use of his deposit money, under c. 93A, Mitchell is entitled to reasonable attorneys fees and costs, all to be determined and added to the judgment. Golber v. Baybank Valley Trust Company, 46 Mass.App.Ct. 256, 261 (1999). Finally, additional damages are permitted for any willful or knowing deceptive act or practice, and willfulness can be, and has been, inferred. See Service Publications Inc. v. Goverman, 396 Mass. 567, 578, n.13 (1986). Consequently, double damages are appropriate in the instant case, but only with respect to the interest on the $5,000 deposit. See Cohen, 41 Mass.App.Ct. at 756.
ORDER FOR JUDGMENT
Based on the foregoing, this court ORDERS the following: (1) judgment shall enter against The Money Store in the amount of five thousand dollars plus double statutory interest calculated from November 24, 1992 to the present; (2) defendants shall pay the plaintiffs reasonable attorneys fees and costs, which shall be determined after further submissions to the court.[9]

 In November of 1993 The Money Store Massachusetts, Inc. merged with TMS Mortgage, Inc., which thereafter conducted business in the name of TMS Mortgage, Inc., d/b/a The Money Store. In 1998 First Union Corporation obtained ownership and control of TMS Mortgage, Inc., d/b/a The Money Store.

 Mitchell owned the property jointly since 1980. He obtained sole ownership to the property pursuant to a deed from Deborah A. Casey, a/k/a Deborah A. Sharleville, dated February 9, 1989. It was his residence.

 According to the Certificate of Municipal Liens issued by the City of Worcester, dated November 20, 1992, the property was subject to delinquent taxes for fiscal years 1989 through 1992 at the time of the foreclosure sale, November 24, 1992. The City placed the property into tax title, totaling $6,628.59. In addition, taxes assessed for the first and second quarters of fiscal year 1993, in the amount of $661.98, and unpaid water assessments, totaling $454.68. In all, delinquent taxes and assessments amounted to $7,745.25 constituting a senior lien. The successful bidder would be required to make arrangements to pay the tax lien as well as the balance of the sale price at the closing.

 A substantial portion of the cash deposit was lent to Mitchell by his employer. Mitchell has since repaid that loan.

 According to Attorney Raphaelson, whom the Court found to be credible, such extensions, given orally or in writing, are not uncommon. Furthermore, The Money Store does not dispute that an oral extension was given to Mitchell.

 940 Code Mass.Regs. §3.16 reads in pertinent part:
Without limiting the scope of any other rule, regulation or statute an act or practice is a violation of G.L. 93A, §2 if: (1) It is oppressive or otherwise unconscionable in any respect; or (2) Any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not enter into the transaction;

 Plaintiff also advances contract and deceit claims on these same facts. However, because duplicative damages under other theories may not be awarded based on the same facts, this court need not address these claims. Briefly, because Mitchell was unable to obtain financing he failed to tender the balance of the purchase price by January 24, 1993. Although the P&S Agreement executed at the time of the foreclosure sale provided for forfeiture of deposit if the remainder of the purchase price was not tendered, “[i]t is fundamental that a promisor may not avoid his promised performance based on the nonoccurrence of a condition, where the promisor has himself hindered or prevented its occurrence.” Lobosco v. Donovan, 30 Mass.App.Ct. 53, 56 (1991) (where defendant prevented completion of sale so as to take advantage of higher offer was wrongful act requiring him to pay broker’s commission for thwarted sale); see also Rigs v. Sokol, 318 Mass. 337, 345 (1945). Mitchell’s failure to perform is excused; by failing to provide Mitchell with a copy of the signed P&S Agreement, The Money Store hindered Mitchell’s efforts to obtain financing. The Money Store breached the implied covenant of good faith and fair dealing. This court would find that recovery is also warranted under contract law.

 Although Mitchell’s employer testified he was willing to co-sign a loan “if need be,” there was no evidence that any financial institution would have granted a loan.

 Consistent with the procedures of Superior Court Rule 9A, plaintiff shall submit his request for attorneys fees to the defendants’ attorney, on or before November 22, 2000, and thereafter to the court.