Sikora, J.

FINDINGS.

In accordance with Mass.R.Civ.P. 52(a), the court finds each of the following facts to be established by a reasonable preponderance of the evidence introduced at the jury-waived trial of this action.

The Parties and Their Principals

1. The plaintiff Massachusetts Technical Development Corporation (“MTDC”) is a venture capital company. The Massachusetts Legislature originally created MTDC as a governmental agency designed to assist emerging technology companies with financing during the early stages of development.
2. Over time MTDC evolved into a private investment company. Aboard of directors governs MTDC. It maintains offices in Boston.
3. From 1990 to 1999 Robert Creeden served with MTDC as an associate, senior associate, and then vice president. He had earned a bachelor’s degree from Holy Cross College; a master’s of business administration from Suffolk University; and had accumulated substantial experience in the high technology venture capital culture. At the time of the events of this case he worked as a vice president. His responsibilities were to receive and to evaluate requests for investment; to investigate (or to perform “due diligence” upon) such requests; and to recommend to the board participation in suitable investment opportunities. During the 1990s MTDC received annually up to 500 requests or proposals from applicants for venture capital.
3. The plaintiff Zero Stage Capital, Inc. (“Zero Stage”) is a private venture capital company in the form of a partnership. It originated in 1980. It maintains offices in Massachusetts, Rhode Island, Connecticut, and Pennsylvania. Its Massachusetts location is Cambridge. Its avowed investment policy had been to identify, and to purchase ownership interests in socially useful start-up companies.
4. The founder and president of Zero Capital is Paul M. Kelly. Mr. Kelly earned a bachelor’s degree from Harvard College and a master’s degree in business administration from Northeastern University. He accumulated experience as a military officer, an employee at the Gillette Company, and then as the proprietor of a prior business (United Power Systems) which he sold. After a brief period of retirement, he founded Zero Stage.
5. The defendant, counterclaimant Harvard Clinical Technology, Inc. (“Harvard Clinical”) has evolved through several periods of business life. It began in 1904 as an enterprise owned by the Harvard Medical School. For decades it developed and manufactured equipment for physiology instruction and for the ad *691 ministration of drugs to animals. In 1980 Mr. Paul Grindle purchased the corporation then named the Harvard Apparatus Company. From 1980 to 1996 the company conducted a division focused upon research in animal medicine and a division devoted to the development of medical equipment. The medical equipment division in the 1980s and 1990s concentrated especially upon the development of a sophisticated pumping device for the injection of medication into human patients including the delivery of multiple medications during surgical procedures (“the pump”). The company is located in Natick.
6. Paul Grindle was an experienced entrepreneur born in 1920 and involved in multiple business activities and companies from 1943 onward. In particular he had purchased and run an optical equipment company in England from 1955 to 1975. From the time of his purchase of Harvard Apparatus in 1980 he had served as its chief executive officer. In 1996 he chose to sell the animal medicine division, and to retain the medical equipment division under the name of Harvard Clinical Technology, Inc.
7. (a) In 1988 Mr. Grindle had employed Diane Gargano as a product manager. Ms. Gargano held a 1984 bachelor’s of science degree from Princeton University in electrical engineering and computer science. From 1985 to 1988 she was employed at Massachusetts General Hospital as a member of a product and management design group. At Harvard Apparatus Gargano worked intensely upon the development of the pump and upon the refinement of its prototypes. The product became known as the “dual syringe pump.” It developed the capacity to compute and to administer multiple dosages of medication. From 1988 to 1996 Gargano introduced 51 novel improvements to the device and enabled the product to house an expansive medication library or memory. It developed the capacity to safeguard against drug injection errors.
(b)By early 1996 the pump had received approval from the Food and Drug Administration for marketing. Grindle had enlarged Gargano’s role from product development to market development as well. He reduced his role to that of treasurer; and established Gargano as the effective chief operating officer and president.

The Venture Capital Negotiations of 1996

8. By March of 1996 Harvard Clinical was eager to market the dual syringe pump. During 1995 and early 1996 Grindle and Gargano had visited 16 venture capital companies in search of investors, but without result.
They were seeking an investment of one million dollars for a marketing program. The search led Gargano to contact MTDC and Robert Creeden.
9. Creeden and Gargano negotiated during the period of March into May of 1996. Gargano made a presentation to the MTDC board of directors. The following terms developed.
(a) MTDC was seriously interested in an investment. However, its usual range of risk in a single venture did not exceed $250,000.
(b) For larger investments it typically sought out a companion venture capital company to participate. In this instance Creeden notified Zero Capital of the opportunity. The two' investors had collaborated in prior transactions. Both had a history of investment in high-tech start-ups, the role now occupied by Harvard Clinical in its new management structure and in its introduction of the dual syringe pump product.
(c) Zero Stage contacted Gargano most probably in April. Gargano made a presentation to its board. Zero Stage expressed a willingness to invest the remaining $750,000 necessary to achieve Harvard Clinical’s goal of one million dollars of equity financing.
(d) The venture capital companies wanted an aggregate ownership share of approximately 25% to 35% in the form of preferred class A stock.
(e) The investment would not become final until (i) the parties had executed an agreement upon the terms in the form of “term sheets” or “commitment letters”; (ii) the investors had completed exhaustive due diligence investigation of the venture requiring as much as four or five months; and (iii) all parties had completed a comprehensive “closing” transaction confirming all terms and commitments by means of purchase agreements and related legal documénts.
10. By letter of May 13, 1996, Creeden reported to Gargano a vote of approval of a $250,000 investment by the MTDC board of directors; he itemized remaining terms and a timetable for a closing by August 9; and he requested and received Gargano’s countersignature of general acceptance of MTDC’s expressed commitment. See Trial Exhibit 1.
11. The MTDC letter of May 13 contained one term of potential significance (paragraph 4) (emphasis supplied):
You understand and agree that all legal and out-of-pocket costs and expenses incurred by MTDC (including the reasonable fees and expenses of counsel for MTDC) in connection with this transaction will be borne by you regardless of whether the transaction closes.
12. Harvard Clinical found the substantial interim before a closing to be a significant problem. Its finances were low. It might run out of funds during the summer. In particular it wished to participate in a major medical equipment trade show in mid-October and to showcase the pump (in the form of multiple prototypes) there to potential purchasers, distributors, licensees, and to the industry journalists and media.
*692 13. Between mid-May and mid-July, Harvard Clinical, MTDC, and then Zero Stage as it came into the negotiations, discussed a loan or “bridge loan” of $250,000 to tide Harvard Clinical over until a closing upon the stock purchase.
14. (a) On July 18, Creeden FAXED to Gargano a letter of proposal for an “advance” of $125,000 upon several itemized terms, and requested her agreement by countersignature. Both Grindle and Gargano examined the letter’s terms. A full copy of the July 18 letter or “term sheet” appears as Exhibit 1 of the present Findings. Gargano countersigned it. See Trial Exhibit 2.
(b) On July 24, Paul Kelly as president of Zero Stage FAXED a letter of proposed terms for an advance of $125,000 to Gargano for her agreement by countersignature. See Trial Exhibit 3. A copy of that letter or term sheet appears as Exhibit 2 of the present Findings. It brought the aggregate advance to the target amount of $250,000. Gargano executed it.
(c) The terms for both advances were identical:
Amount Up to $125,000
Vehicle Bridge Demand Note
Interest Rate 10%
Other Conditions (1) Note and accrued interest will convert on terms and conditions of a financing totaling 1.0 million; and (2) Harvard Medical will give [MTDC and Zero Stage, respectively] a detachable warrant to purchase 2,000 shares of common stock at $0.01 per share.
(d) On or shortly after July 18, Creeden visited Harvard Clinical’s office in South Natick to discuss the letter terms. From that discussion Gargano formed the understanding that the stock warrants would issue at the time of the ultimate closing and simultaneously with the conversion of the advance of the $250,000 to a portion of the Harvard Clinical’s equity to be owned by the venture capital companies. Gargano had never before dealt with “detachable warrants.” Nor had Grindle.
(e) Venture capital companies often use detachable warrants as consideration and security from unproven start-up enterprises lacking a history of earnings, confronting a high risk, and needing cash in advance. The venture investor makes the advance or bridge loan and takes back a detachable warrant as an option to buy a certain amount of stock at a minimal price as some security and as a reward for the assumption of the greater risk of investment in an unproven company. The “detachable” character of the warrant means that its is “separable” or independent from the surrounding terms of the overall transaction in which it arises. It constitutes an independent or free standing obligation of the invested company even if the larger transaction does not proceed to completion or fruition.
(f) Creeden does not have a specific memory of explaining the nature of a detachable warrant to Gargano at their meeting on or about July 18, 1996.
(g) Gargano understood the detachable warrant obligation to be dependent upon the completion of the one-million-dollar equity investment. Her deposition testimony of December 17, 1998, does not contradict that understanding (her trial testimony; and her deposition transcript at 38 11. 8-19).
15. To implement the term letters, Gargano on July 30 and August 5 executed the Promissory Notes covering the respective advances (Trial Exhibit 15) and the accompanying All Assets Security Agreements pledging Harvard Clinical's inventory, accounts receivable, and equipment as collateral for the advances (Trial Exhibit 16).
16. Harvard Clinical then received the aggregate advance or bridge loan of $250,000.
17. The combined 4,000 shares covered by the warrants amounted to approximately 4% of the estimated four million dollar value of Harvard Clinical at that time.
18. During the summer the parties set September 12 as the target date for the closing. That date did not hold up for several reasons.
(a) Two Harvard Clinical employees were refusing to sign agreements restricting their right to compete with the company and requiring them to maintain the confidentiality of business and technical information about the pump. While Gargano did not view the employees as potentially harmful, Kelly regarded them as key personnel. At several meetings with Gargano, Kelly required the resolution of the problem as a prerequisite to the closing.
(b) Attorneys working on the transaction judged Harvard Clinical’s organization as a Sub S corporation to be unwise for tax purposes, and wanted a reorganization before closing. Kelly agreed.
(c) As September approached, the venture capitalists’ due diligence work was still incomplete. They raised questions about the location of some of the company’s book assets.
(d) When the September date became impracticable, the parties rescheduled the closing to December 13.

The October Trade Show

19. Gargano attended the industry trade show from October 15 to 20. She displayed 10 prototype models of the pump. The response was strongly positive. Numerous clinicians examined the device with approval. Distributors approached and expressed interest. One of those was the Ohmeda Company, a large medical equipment firm able to offer its own financing to small originators of valuable products. Creeden attended and observed the favorable impression made *693 by the pump. After the show the parties returned to the preparation of the closing.

Preparation for the December Closing

20. Primary responsibility for the organization of the closing had come to rest upon attorney Jeffrey Donaldson at Mirick, O’Connell, DeMallie & Lougee, LLP, counsel to MTDC.
(a) On November 7, 1996, attorney Donaldson directed to all interested parties and personnel a memorandum list of “open items” needing resolution for the closing. The list contained 13 tasks. One of these was to determine “(t]he length of investor warrants.” Trial Exhibit 13, page one.
(b) Attorney Donaldson followed up with a similar memorandum on or about December 4, 1996, distributed to the same interested parties and entitled “Closing Documents.” The updated list of necessary “Closing Documents” amounts to 15 items or categories. Item 11 consisted of “Common Stock Purchase Warrants” to be prepared by Mirick, O’Connell for MTDC and Zero Stage. Trial Exhibit 14, final two pages.
21. (a) On December 12, the day before the scheduled closing, Creeden brought the detachable stock warrants for both MTDC and Zero Stage to Gargano for her signature. In September she had referred the drafts of the warrants to Harvard Clinical’s law firm, Foley, Hoag & Eliot. On December 12 she negotiated one element of the warrants before signing or executing them: their duration. Creeden agreed to reduce the period for their exercise by MTDC and Zero Stage, respectively, from seven years to five years. The deadline would be December 31, 2001, rather than December 31, 2003.
(b) Creeden and Gargano amended the deadline in ink. Gargano signed. Each venture capital company had the right or warrant to purchase up to 20,000 shares (revised from the term letter number of 2,000 shares to remain proportionate under the intervening restructure of the stock) at the price of $0.01 per share. Trial Exhibits 4 and 5.
22. Later in the day on December 12, Creeden FAXED a memorandum to Gargano. Trial Exhibit 19. It reported in the opening paragraph that the closing could not go forward on the next day (opening paragraph):
I have just spoken with investors’ counsel and have a fairly long list of documents/decisions that need to be solved prior to our closing. As a result of looking at this list, I do not believe we will close tomorrow. However, Jeff Donaldson said he would keep the day slotted to the MTDC/Harvard deal so that we might be able to solve these issues and actually fund early next week.
He went on to itemize 11 unfinished tasks, some of them held over from the earlier punch lists organized by attorney Donaldson.

Post-December 13 Events

23. The failure of the December 13 closing date slowed progress between Harvard Clinical and the venture capitalists. Negotiations continued into February 1997, with diminishing momentum. Grindle became skeptical about the investors’ intentions. The unfinished decisions and documents did not move to completion. Meanwhile from December 1996 though mid-March 1997, the Ohmeda Company carried on negotiations with Harvard Clinical to acquire the right to distribute the pump. By the close of March they had concluded an arrangement under which Ohmeda provided $1,625,000 in debt financing and the guaranteed purchase of a fixed number of pumps in exchange for exclusive distribution rights for four years.
24. By the close of May 1997, Harvard Clinical repaid to MTDC and Zero Capital the "advances” or “bridge loans” of $250,000.00 with all accrued interest.

The Venture Capitalists' Attempted Exercise of the Warrants

25. On August 1997, Creeden forwarded to Gargano a notice of MTDC’s partial exercise of its warrant to purchase 1,000 of the authorized 20,000 shares of common stock, along with a check of $10.00 and a cover letter. Trial Exhibit 7. In the cover letter he described MTDC’s intended status as one of stockholder and requested Harvard Clinical to pay the legal fees and costs generated by the investors’ lawyers in the failed venture capital effort (as provided by MTDC’s original approval letter of May 13, 1996, Trial Exhibit 1). He reserved MTDC’s option to exercise the warrant to purchase the remaining 19,000 shares through the expiration date of December 31, 2001.
26. The aggregate value of the 40,000 shares covered by the two warrants still approximated 4% of the company’s worth.
27. Gargano conferred with Grindle. On August 12, 1997, he wrote to Creeden that Harvard Clinical had understood the stock warrants to comprise one element of consideration for the full investment of one million dollars by the two venture capital companies and that the failure of that transaction and the repayment of the advances had effectively “canceled” the warrants. Trial Exhibit 8.
28. On August 15, 1997, Zero Capital forwarded to Gargano its notice of partial exercise its warrant to purchase 1000 of the authorized 20,000 shares of common stock, a check for $10.00, and a cover letter asserting its intention to become a shareholder. Trial Exhibit 9.
29. On August 18, 1997, Creeden responded by letter to Grindle. Trial Exhibit 10. His opening paragraph summarized the position of MTDC and Zero Stage through the subsequent communication and in the present litigation.
*694 I received your letter of August 12 and agree that you clearly do not understand the terms and conditions of the note and warrant issued to MTDC. The warrant that was issued to MTDC is detachable, meaning that this is a separate transaction from the note and remains active even if and when the note is paid in full. As such, repayment of the note does not cancel the warrant. The warrant remains in place until it is either exercised or the expiration date occurs, which in this case is December 31, 2001.
30. Harvard Clinical refused to recognize the warrants of both MTDC and Zero Stage. It declined to issue the requested 2,000 shares and to renew the warrants for the remaining 38,000 shares.
31. MTDC renewed its demand for partial exercise and issuance of 1,000 shares by letter from Creeden to Gargano on October 27, 1997. Trial Exhibit 11.
32. (a) Harvard Clinical then did pay the legal fees and costs of $23,484.72 charged by Mirick, O’Connell, DeMallie & Lougee to MTDC for work upon the investment transaction (Trial Exhibit 12B; testimony of Paul Grindle; and agreement of the parties at trial). Gargano and Grindle understood that obligation to function independently of the closing or completion of the one million dollar equity investment, in accordance with the letter agreement of May 13, 1996, drafted by Creeden (Trial Exhibit 1, paragraph 4).
(b) Harvard Clinical maintained its position that the detachable stock warrants constituted an element of consideration for the million dollar equity investment; and that the failure of the closing invalidated them.
33. The stalemate generated the present suit.

RULINGS OF LAW

Upon those findings the court reaches the following conclusions of law. Mass.R.Civ.P. 52(a).

Interpretation of the Parties’ Agreement

1. As the parties contend, the outcome of the dispute hinges upon a correct interpretation and application of the respective term letter agreements of July 18, 1996, between MTDC and Harvard Clinical (Trial Exhibit 2 and Appendix I hereto) and July 24, 1996, between Zero Stage and Harvard Clinical (Trial Exhibit 3 and Appendix 2 hereto).
2. The interpretation of an unambiguous contract is a question of law for the trial judge. E.g., Robert Industries, Inc. v. Spence, 362 Mass. 751, 755 (1973); Quentin Vespa, Inc. v. Construction Service Co., 343 Mass., 547, 551 (1962); and Lew is v. Commonwealth, 332 Mass. 4, 6 (1954).
3. The interpretation of an ambiguous contract presents a question of fact and law to the trial judge. To resolve the uncertainty the judge may examine at least several sources: (a) most obviously the immediate words of the vague term or terms, Wood v. Roy Lapidus, Inc., 10 Mass.App.Ct. 761, 764 (1980), and Fay, Spofford & Thorndike v. Massachusetts Port Authority, 7 Mass.App.Ct. 336, 341-42 (1979); (b) both the entire contractual scheme and related documents, Glick v. Greenleaf, 383 Mass. 290, 296 (1981); and (c) the circumstances of the formation of the agreement and the objectives of the parties, Shea v. Bay State Gas Company, 383 Mass. 218, 222-23 (1981).
4. The preliminary issue of the existence of an ambiguity in a contract is itself a question of law. Frank Construction Corp. v. Republic Powered Metals, Inc., 11 Mass.App.Ct. 972 (1981). See also Boston Helicopter Charter v. Augusta Aviation, 767 F.Sup. 363, 370 (D.Mass. 1991).
5. In this instance I make the preliminary determination that both the term letter agreements of July 18 and July 24, 1997, contain a critical latent ambiguity: the meaning and operation of a “detachable warrant” in the circumstances of the “advance” and investment contemplated by the parties. The ambiguity is whether the “detachable warrant” introduced in the letters constitutes an independent or free standing obligation of Harvard Clinical; or an obligation dependent upon, and in consideration of, a completed investment by MTDC and Zero Capital of one million dollars in Harvard Clinical.
6. The critical language. The contractual text is the starting point. It provides several indications.
(a) The opening sentence of the MTDC letter of July 18, 1996, reports that the board of directors has approved “an advance of up to $125,000" upon the itemized terms. The "advance" is a prospective or forward looking reference to the ultimate equity investment of one million dollars. The “advance” points forward to a postcedent transaction. It connects the $125,000 to the one million dollars. Although the Zero Stage term letter of July 24, 1996, does not use the word “advance,” in the total context no doubt remains that the Zero Capital $ 125,000 repayment also is a component of the contemplated one-million-dollar investment. This connection tends to integrate the $250,000 transaction into the larger eventual investment. It promotes as a natural meaning of the letters the impression that the issuance of the warrants is one element of the one-million-dollar bargain and not a separate and independent agreement for the exchange of the warrants for the advance of a $250,000 bridge loan. The concept of an “advance” integrates, rather than separates, the transactions of $250,000 and one million dollars.
(b) The identical placement and grammar of the $125,000 itemized “terms” are significant. After recital of the principal, demand note vehicle, and the 10% interest rate, each letter itemizes the identical “other conditions” as follows:
(1) Note and accrued interest will convert on terms and conditions of financing totaling $1.0 million; and (2) Harvard Medical will give [MTDC] [Zero Stage] a detachable warrant to purchase 2,000 shares of common stock at $0.01 per share.
*695 This language is the most specific description of the relationship between the $250,000 advance and the one-million-dollar closing. In the following particulars it treats the detachable warrants as an element of consideration for the final investment and not for the earlier advance, (i) It combines the final investment and the detachable warrant as coordinate clauses in one elongated compound sentence joined by a semicolon and the conjunction “and” so as to the merge them into a logically single transaction (as Grindle points out in his letter to Creeden on August 12, 1997, Trial Exhibit 8). (ii) It uses parallel clauses in the same future tense to indicate that the advance “will convert” into the total investment and that Harvard Clinical “will give” the detachable warrants at that same time [and reasonably inferably as part of the same transaction as an element of consideration].
If MTDC and Zero Stage had intended to establish the detachable warrants as an independent obligation, they could have and should have placed the warrants in a separately numbered or bulleted paragraph or sentence with the clear provision that they created an obligation even without the closure of the investment. MTDC had written such a clear term in its May 13, 1996, letter requiring Harvard Clinical to pay the legal fees and costs “regardless of whether the transaction closes.” Trial Exhibit I, paragraph 4. Harvard Clinical acknowledged that duty. The venture capital companies should have written a similarly distinct clause for the warrants.
7. Related documentation. An expanded examination of the contractual language and related documents leads toward the inference of interdependence. The term letters themselves identify a form of primary consideration for the advance: the 10% interest. That reference renders the detachable warrant obligation as, at best, a subtler, secondary form of consideration. Further, the explicit “All Assets Security Agreement(s)” of July 30 and August 5, 1996, provided primary collateral and rendered the detachable warrant obligation as a subtler, secondary form of security.
8. The Circumstances of formation and post formation conduct, (a) The detachable warrant reference did not receive discussion at the time of its insertion by the investors. Neither Creeden nor Gargano, the effective negotiators of the transaction, have a memory of any attention to it during July 1996, or afterward until its emergence as a dispute in August of 1997.
(b) The parties’ post-formation or subsequent conduct is informative. A party’s actions after the execution of a legal document can provide evidence of its intent at the time of execution. Bourgeois v. Hurley, 8 Mass.App.Ct. 213, 215-16 (1979). “There is no surer way to find out what the parties meant than to see what they have done.” Marino v. First National Bank, 361 Mass. 325, 332 (1972). Usually an investor receiving a detachable warrant as part of a bridge loan transaction takes the warrant simultaneously with the delivery of the loan money. (Testimony of Joseph Stavenhagen. venture capital financing expert called by MTDC and Zero Capital.) Here the investors did not seek the warrants after the delivery of the loan at the end of July 1996. Creeden offered no reasons for the delay. Attorney Donaldson, as their transaction counsel, in November and December listed the completion of the warrant papers to all parties as “closing documents." Finally Creeden did present the warrants for execution by Gargano on December 12, 1996, or one day before the scheduled closing. This pattern of conduct evidences an intent of the investors, as well as that of Harvard Clinical, to treat the detachable warrants as a dependent element of the closing.
9.The theory of the self-evident definition. The investors’ strongest argument is that the term “detachable warrant” is by itself definitive; that it carries the self-evident meaning of an independent and enforceable obligation. I have weighed that reasoning carefully. For several reasons, it is insufficient.
(a) The term is not self-evident or self-illuminating. It is a phrase of financial art requiring further elaboration. The investors have cited definitions from two financial glossaries (Supplemental Trial Memorandum). The Bloomberg Financial Glossary provides (emphasis and parentheses original):
A warrant entitles the holder to buy a given number of shares of stock at a stipulated price. A detachable warrant is one that may be sold separately from the package it may have originally been issued with (usually a bond).
The J.D. Power Consumer Center (a cyberspace lexicon) reads similarly:
A warrant gives the holder the right to buy a certain number of shares of stock at a designated price. A detachable warrant can be purchased separately from the package it may have first been issued with.
Witness Joseph Stavenhagan explained the detachable stock warrant to be a descendant from the generic bond coupon. It had evolved into an instrument or ingredient of venture capital deals. These definitions reveal at least two ambiguities undercutting clear, consistent, and fixed meaning.
(i) First, a warrant more precisely described is already detached and not detachable. Use of the past participle rather than the adjective would much better communicate the idea of the independent or freestanding character of the warrant instrument.
(ii) Second, a supplemental term is necessary to specify (especially in a complex or multifactorial transaction) the particular “package” from which the warrant is detached. In the present case, it remained uncertain (or even misleading) whether the warrant was activated by, and detachable from, the advance bridge-loan transaction package; or closed full investment package.
(b) The investors inserted no supplemental explanation in the critical term letters.
*696 (c)Subjectively, the Harvard Clinical principals had no prior familiarity with the term “detachable warrant.” Objectively, they made a reasonable interpretation of the term in circumstances in which (i) its authors did not include a written elaboration: (ii) did not add any oral guidance: and (iii) by their conduct created a context supporting a meaning of dependence rather than independence of the warrant obligation.
10. The author's burden of clear expression. The reasons canvassed above show, at the least, that MTDC and Zero Stage drafted ambiguous term letters. Massachusetts courts follow the general axiom: they will resolve the ambiguity against its author. Slater v. United States Fidelity & Guaranty Co., 379 Mass. 801, 804 (1980); Merrimack Valley Nat’l Bank v. Baird, 372 Mass. 721, 724 (1977); and Republic Pipe & Supply Corp. v. Mandell, 5 Mass.App.Ct. 848 (1977). The term letter called for an explanation of the detachable warrants of the clarity eventually appearing in Creeden’s October 27, 1997, letter to Gargano attempting to enforce them. (Trial Exhibit 11, first paragraph.)
11. The inapplicability of custom or usage as aguide. In circumstances of missing or vague contractual terms, Massachusetts courts do permit the incorporation of longstanding commercial usages known to all the contracting parties unless the remaining written terms indicate to the contrary. See Baccaris v. A. Perini & Sons, Inc., 293 Mass. 296, 303-04 (1936); Liberty Bank & Trust Co. v. Lipshutz, 5 Mass.App.Ct. 831, 832 (1977); and Hardware Specialties, Inc. v. Mishara Construction Co., Inc., 2 Mass.App.Ct. 277, 280 (1974). However in this instance the usage of detachable warrants was not known to Grindle and Gargano at Harvard Clinical. And the remaining language of the term letters tended to contradict the idea of a detached or independent warrant obligation.
12. (a) The theory of unilateral mistake. The investors’ other major contention is that circumstances show a unilateral mistake of meaning on the part of Harvard Clinical; and that such a mistake leaves the reasonable meaning of the agreement intact and enforceable against the mistaken party. Proposed Conclusion of Law 28 citing Community Builder, Inc. v. Indian Motorcycle Associates, Inc., 44 Mass.App.Ct. 537 (no specific page or discussion identified or found) (1998).
(b) That analysis requires an objectively reasonable and knowable contract meaning about which one party forms a misunderstanding often by faulty perception or judgment. Here for the reasons already discussed, Harvard Clinical’s understanding of the role of the detachable warrants was objectively reasonable in light of the text, context, and conduct of the parties. It did not form a faulty misunderstanding and does not bear resulting duties under an alternate meaning of the agreement.
(c) Finally, if one viewed Harvard Clinical as unilaterally mistaken about the meaning of detachable warrants, that mistake would be excusable and its obligation voidable because the opposing party had caused the mistake. Restatement Second of Contracts §§ 153(b) and 154(c) Comment d and Illustration 6 (1979) [in sum, the party at fault for a mistaken assumption must bear its consequences]. To the same effect see 3 Corbin On Contracts §§611, 612 (1960); and Williston On Contracts (Lord 4th ed. 1991) §6:57 (contractual language will receive objectively reasonable interpretation; a misunderstanding of such language may still qualify for equitable excusal from a contractual duty).

The 93A Claims

13. (a) The plaintiff investors have charged Harvard Clinical with conduct unfair or deceptive in violation of G.L.c. 93A, §2 [Complaint Count Four).
(b) Harvard Clinical has reciprocated with a 93A claim in Count Three of its Counterclaim.
14. The evidence at trial does not support c. 93A liability on the part of any of the parties.
(a) No parly has engaged in conduct of a coercive or extortionate nature resulting in harm to its opponent. Contrast Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 474 (1993); Wang Labs, Inc. v. Business Incentives, Inc., 398 Mass. 854, 857 (1986); and Atkinson v. Rosenthal, 33 Mass.App.Ct. 219, 226 (1992).
(b) Nor has any party intentionally breached the agreement governing the detachable warrants in a bad faith effort for its own gain. Anthony’s Pier Four, Inc., at 474; Wang Labs, Inc., at 857; Atkinson at 226. See also Massachuset Employees Insurance Exchange v. Propac-Mass, Inc., 420 Mass. 39, 43 (1995), and the discussion in Kobayashi v. Orion Venturers, Inc., 42 Mass.App.Ct. 492, 505 (1997), distinguishing 93A violations from ordinary controversies of contract breach.
(c) The evidence does not support a finding of any egregious rascality. See Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979); and Doliner v. Brown, 21 Mass.App.Ct. 692, 698 (1986).
(d) The evidence is insufficient to support a finding of tortious intentional misrepresentation or deceit by any party.
(e) The evidence is insufficient to support a finding of tortious negligent misrepresentation by any party.

CONCLUSION

15. (a) The language of the parties’ agreement and of related documents, the circumstances of their formation, and the subsequent behavior of the parties converge in the conclusion that the exercise of the detachable warrants required the completion of the full million-dollar investment.
(b) A conforming final judgment will enter in favor of the defendant-counterclaimant Harvard Clinical Technology, Inc.