Lauriat, J.
Juncker Associates & Co., Inc. (“Juncker") brought this action against Dominic Enes (“Dominic”), its former employee, and Toni Ann Enes (“Toni Ann”), his wife, for tortious interference with a contractual or advantageous business relationship (Counts I and II), breach of fiduciary duty (Count III), violation of G.L.c. 93A (Count IV), and civil conspiracy (Count V), arising from the defendants’ alleged tortious conduct both while Dominic was employed by Juncker and after he left Juncker’s employ.
*197 After a five-day trial in March of 2002, the court allowed Toni Ann’s motion for a directed verdict in her favor on all of Juncker’s claims (Counts I, II, IV and V), and allowed Dominic’s motion for a directed verdict on Juncker’s civil conspiracy claim (Count V). The jury thereafter returned a verdict on special questions in favor of Juncker against Dominic on Juncker’s claims of tortious interference (Counts I and II), and breach of fiduciary duty (Count III). The jury awarded Juncker damages of $40,867.05 on the tortious interference claims, but no damages on the breach of fiduciary duty claim. The court reserved to itself the determination of Juncker’s G.L.c. 93A claim.
Upon consideration of the credible testimony of the witnesses, the exhibits admitted into evidence, and the reasonable inferences to be drawn therefrom, and the memoranda and arguments of counsel, the court makes the following findings of fact and rulings of law on Juncker’s G.L.c. 93A claim.
FINDINGS OF FACT
Juncker is a small, closely held Massachusetts corporation located in Gloucester, Massachusetts. Since 1991, it has been in the business of buying and selling frozen fish in the wholesale marketplace, buying and selling used fish processing equipment, and consulting with fish processors on fish processing and used processing equipment. Dennis DiGregorio (“DiGregorio”) owns and is President of Juncker.
In 1997, Juncker employed Dominic to do fish processing consulting and fish processing equipment sales and consulting. DiGregorio and two or three other Juncker employees spent most of their time and efforts buying and selling frozen fish.
In June 1999, Dominic learned of a quantity of undocumented frozen fish that was available for purchase and sale. When Dominic brought this matter to DiGregorio’s attention, DiGregorio refused to become involved because there was no way to determine the origin or age of the fish. Dominic thereafter sold the fish to the Gloucester House Restaurant for $1,400. (Exhibit 5.)
In December of 1999, Dominic was paid $10,000 by M&M Equipment Corporation, a customer of Juncker, in connection with the purchase and sale of used fish processing equipment. (Exhibit 6.) Since this transaction took place while Dominic was employed by Juncker, the transaction should have been undertaken through Juncker and any commission paid to it. Instead, Dominic concealed the transaction from Juncker, and later claimed that he was paid the check for consulting work that he did for M&M.
At some point in late 1999 or early 2000, while an employee of Juncker, Dominic established a business then known and named as DnT Equipment (“DnT”), which he operated out of his home. DnT was in the business of buying and selling frozen fish and used fish processing equipment. When DiGregorio accidentally learned of the existence of this business in January of 2000, and confronted Dominic, Dominic lied about the nature and purpose of DnT’s business, and lied about DnT not competing with Juncker. In fact, from that time forward, Dominic, through DnT, competed with Juncker and even diverted business.and several business opportunities from Juncker to DnT.
In May of 2000, Dominic received a check for $3,000 from TAL Enterprise Inc., a customer of Juncker, which he did not disclose to Juncker. (Exhibit 10.) Although Dominic claimed that this check constituted a personal loan that TAL made to him, there is no documentation or evidence to support this assertion, nor has Dominic ever repaid the loan, and it appears far more logical and likely that it was a commission or payment to Dominic in connection with equipment TAL sold to Juncker on or about May 24, 2000. (Exhibit 9.) •
On May 8, 2000, Robert F. Wyatt d/b/a Robert F. Wyatt Fabrication, one of Juncker’s customers, gave Dominic a check in the amount of $3,000. (Exhibit 8.) Although Dominic has asserted that this payment constituted Wyatt’s repayment of a loan from him, there is no documentation or evidence to support this assertion, and it appears far more logical and likely that it was a commission or compensation from Wyatt to Dominic.
In August of 2000, Dominic made a deal on behalf of Juncker for the purchase of used fish processing equipment from Resources Trading and the sale of that equipment to Northern Winds. While Juncker charged Resources Trading a $2,000 commission in connection with the transaction (Exhibit 14), Dominic also received a check for $2,000 from Northern Winds. (Exhibits 5 and 15.) Although Dominic claimed that the payment was a gift and that he therefore did not advise DiGregorio about it, it is much more likely that it was a commission paid to DiGregorio by Northern Winds in connection with its purchase of the equipment.
On October 1, 2000, shortly after Jim Kallenberg of-Starfish, Inc. met with DiGregorio and then Dominic at Juncker’s office in Gloucester to discuss the purchase of used fish processing equipment, Dominic sold Starfish six pieces of equipment through DnT for $41,000. (Exhibit 18.) On October 16, 2000, Dominic sold Starfish an additional piece of equipment through DnT for $3,500. (Exhibit 23.) On October 25, 2000, Starfish paid DnT $24,000 for some of the equipment it had purchased. (Exhibit 29.) DnT deposited that check into its business account on October 30, 2000. (Exhibits 44 and 45.) According to Dominic’s own calculations, DnT made a profit of more than $21,000 on these sales, although they were made while Dominic was still an employee of Juncker. (Exhibit 24.) Dominic also agreed to act as a liaison and quality control inspector for Starfish in Gloucester, Massachusetts, at a rate of $4,000 per month, in connection *198 with a fish processing agreement reached between Starfish and National Fish and Seafood, Ltd. in or about late October or early November 2000. (Exhibits 33-36 and 40-42.)
On October 9, 2000, Dominic, on behalf of one of Juncker’s customers, requested and received a price quote from WEI Equipment for certain used fish processing equipment. (Exhibit 17.) He then advised WEI that Juncker’s customer was no longer interested in that equipment, and he declined to purchase the equipment at that time. (Exhibit 26.) One week later, while he was still an employee of Juncker, Dominic inquired about and then purchased some of the same equipment from WEI on behalf of one of DnT’s customers, and had the equipment shipped to DnT. (Exhibits 17, 26 and 28.) On October 30, 2000, his last day of employment at Juncker, Dominic paid WEI for the equipment with a check drawn on a newly established DnT account. (Exhibits 19 and 21.)
On October 30, 2000, Dominic left Juncker’s employ. Although Dominic told DiGregorio that he was burned out and tired of the fish processing business, and that he was planning to work as a carpenter or electrician, Dominic in fact began to work at DnT processing and selling frozen fish and used fish processing equipment in competition with Juncker.
RULINGS OF LAW
Before reaching the merits of Juncker’s c. 93A claim, the court must address two preliminary issues.
First, Juncker’s amended verified complaint does not state whether Count IV seeks relief under §9 or §11 of G.L.c. 93A. The distinction is important, as different jurisdictional, procedural, and substantive standards apply to each section. From the bent of Juncker’s allegations, its corporate status, and the foregoing facts, the court concludes that Count IV seeks relief under §11. Accordingly, Juncker’s omission, though unfortunate, is not fatal.[1]
Second, Dominic asserts that G.L.c. 93A is inapplicable because he was at all relevant times employed by Juncker. See Informix v. Rennell, 41 Mass.App.Ct. 161 (1996). There, the plaintiff, defendant’s former employer, sought to hold him liable under G.L.c. 93A for breaching a non-compete agreement. Informix v. Rennell, 41 Mass.App.Ct. at 161-62. The Appeals Court denied relief, reasoning that G.L.c. 93A, §11 applies only to trade or commerce between discrete business entities, not to intra-company disputes such as those arising out of employment agreements. Informix v. Rennell, 41 Mass.App.Ct. at 163, citing Manning v. Zuckerman, 388 Mass. 8, 14 (1983).
Unlike Informix, the dispute in this action did not arise out of an employment agreement between plaintiff and defendant. Rather, the present dispute arose between Juncker and DnT, two discrete business entities, and the actions of Dominic that Juncker challenges were undertaken by him as DnT’s agent.[2] In this respect, Dominic’s actions resemble those of the defendants in Peggy Lawton Kitchens, Inc. v. Hogan, 18 Mass.App.Ct. 937 (1984), and Ann & Hope, Inc. v. Muratore, Civ. No. 90-1447 (Suffolk Sup. Ct., July 20, 1992) (Botsford, J.).
In Peggy Lawton Kitchens, Inc., the Appeals Court upheld the trial court’s decision that the defendant’s theft of his former employer’s chocolate chip cookie recipe merited relief under G.L.c. 93A, §11 when a company run by the defendant began selling cookies “similar in appearance, color, cell construction, texture, flavor and taste” to those of the plaintiff. Peggy Lawton Kitchens, Inc. v. Hogan, 18 Mass.App.Ct. at 938, 940. Likewise, in Ann & Hope, Inc., Judge Botsford found the defendants liable under G.L.c. 93A, §11 for fraudulently persuading their employer to buy overpriced warranties from a company that they secretly owned. Ann & Hope, Inc. v. Muratore, Civ. No. 90-1447 (Suffolk Sup. Ct., July 20, 1992). The court thus concludes that Dominic’s actions, like those of the defendants in Peggy Lawton Kitchens, Inc. and Ann & Hope, Inc., occurred in trade or commerce and were “independent of and did not arise from [his] employment relationship” with Juncker. Informix v. Rennell, 41 Mass.App.Ct. at 163 n. 2 (distinguishing the facts of that case from those of Peggy Lawton Kitchens, Inc.). The court must now determine whether Dominic’s actions were unfair or deceptive and if so, with what quantum of intent they were committed.
Although the factual record before it raises issues of deception, the court views this action as one that is principally grounded in the unfairness of Dominic’s business actions. In determining whether Dominic’s actions were unfair under G.L.c. 93A, §11, the court must consider whether they were “within at least the penumbra of some common-law, statutory, or other established concept of unfairness” or whether they were “immoral, unethical, oppressive, or unscrupulous.” Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 778 (1986). The marriage of Dominic’s actions to this standard presents a question of fact to be determined from the circumstances of the case. USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 124 (1989); Dowd v. Iantosca, 27 Mass.App.Ct. 325, 326 (1989).
Here, the factual record amply supports the jury’s conclusion that Dominic’s actions constituted a tortious interference with a contractual or advantageous business relationship. The jury’s conclusion, and the court’s concurrence with it, evinces that Dominic’s actions were within a concept of unfairness established at common law. For this reason, the court concludes that Dominic’s actions merit relief under G.L.c. 93A, §11.[3] The court further concludes that because Dominic’s actions were willful and intentional,[4] the damages awarded by the jury at trial should be trebled to total $122,601.15. G.L.c. 93A, §11.
*199 In addition to these damages, Juncker is entitled to an award of reasonable attorneys fees and costs. G.L.c. 93A, §11. Accordingly the court orders that Juncker serve upon Dominic an itemized affidavit of its attorneys fees and costs in this action by or before September 30, 2002, that Dominic serve his response to Juncker’s affidavit by or before October 18, 2002, and that Juncker thereupon file the parties’ papers with the Clerk in the Lawrence Superior Court and with the trial judge in Courtroom 11A in the Cambridge Superior Court.
ORDER
Upon consideration of the foregoing findings and rulings, it is hereby ORDERED that judgment enter in favor of the plaintiff Juncker Associates & Co., Inc. against Dominic Enes on Count IV of this action in the amount of $122,601.15, together with reasonable attorneys fees and costs in an amount to be hereafter determined by the court.

By contrast, if G.L.c. 93A, §9 governed this case, Juncker’s failure to allege the sending of a detailed demand letter to the defendants at least 30 days before filing suit would require dismissal of its G.L.c. 93A claim. Boston v. Aetna Life Ins. Co., 399 Mass. 569, 574 (1987).

Although Dominic has not raised the argument, it might be contended that he cannot be held personally liable under G.L.c. 93A, §11 because he was only acting as DnT’s agent. Any such argument must, however, fail. See Bolen v. Paragon Plastics, Inc., 754 F.Sup. 221, 228 (D.Mass. 1990), citing Nader v. Citron, 372 Mass. 96, 102-03 (1977) (under G.L.c. 93A, §11, “corporate officers can be held liable for participating in unfair or deceptive practices”); Ann & Hope, Inc. v. Muratore, Civ. No. 90-1447 (Suffolk Sup. Ct., July 20, 1992) (same). It also appears that DnT was a sole proprietorship, entirely owned by Dominic.

An element of tortious interference with a contractual or advantageous business relationship is the use of improper motive or means. See G.S. Enters., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991). Interference with a contract or advantageous business relations by “ ‘improper purpose or improper means’ . . . certainly falls far below the acceptable level of fair dealing that c. 93A was designed to promote ...” Picciuto v. Dwyer, 32 Mass.App.Ct. 137, 139 (1992) (internal citations omitted).

To merit multiple damages under G.L.c. 93A, §11, the unfairness or deception must be willful or knowing. Id. Willful implies not only intent to do an act, but also intent that the act be unfair or deceptive. See Heller v. Silverbranch Constr. Corp., 376 Mass. 621, 627 (1978); Michael C. Gilleran, The Law of Chapter 93A 359 (1989). Both intent to do an act and intent that the act be unfair are elemental to tortious interference with a contractual or advantageous business relationship. See G.S. Enters., Inc. v. Falmouth Marine, Inc., 410 Mass. at 272; supra note 3.